THE PEOPLE OF THE STATE OF NEW YORK, Respondents, *v.* THE CENTRAL RAILROAD COMPANY OF NEW JERSEY, Appellants.

The boundary line between this State and the State of New Jersey, south of the forty-first degree of north latitude, is the middle of the Hudson river, of the bay of New York, of the waters between Staten Island and New Jersey and of Raritan bay to the main sea, except that the islands embraced in these waters and lying west of the middle thereof, belong to and are under the exclusive jurisdiction of this State.

This State has exclusive jurisdiction over the waters to low water mark on the New Jersey shore, and over ships, vessels and craft of every kind afloat in the bay of New York and Hudson river, south of Spuyten Duyvil creek, for quarantine or health purposes, the protection of passengers and property, to secure the interests of trade and commerce, and to preserve the public peace. It is a qualified and limited jurisdiction, for police and sanitary purposes, and to promote the interests of commerce.

Each State has absolute control over its own soil and everything annexed or attached thereto, and over all vessels attached to the piers or wharves, and lying in the docks upon its own shore, or aground on its shore, and over the persons or property on such wharves, docks or vessels, except that all such vessels in the bay of New York and Hudson river are subject to the quarantine or health laws, and laws in relation to passengers, enacted by this State.

The State of New Jersey has exclusive jurisdiction and control over the piers, wharves, docks and other improvements erected or to be erected on the shores of that State. This jurisdiction extends to and embraces the whole subject of such improvements and includes the power to prescribe where, when and how they shall be erected, and to exercise all control over them which government can possess over property of its citizens.

Accordingly,—*Held* (EARL, Ch. J., dissenting), that the courts of this State have no jurisdiction to restrain the erection, or order the removal of structures extending into the bay or river from the New Jersey shore; even if they are a public nuisance, as affecting injuriously the general and common use of those navigable waters.

Although a demurrer, on the ground that the court has not jurisdiction of the subject of the action, has been overruled, the defendant may still raise that question by answer, or on the trial. Submitting to answer after judgment on the demurrer is not a waiver of that right.

(Argued March 25th, 1870; decided June 22d, 1870.)

APPEAL from a judgment entered upon the decision of the General Term of the Supreme Court, in the first judicial dis-

trict, affirming a judgment rendered in favor of the plaintiff, on trial before Mr. Justice SUTHERLAND.

This is an action commenced by the attorney-general in behalf of this State, to abate as nuisances, and cause the removal of certain wharves, bulkhead, piers, and railroad tracks, and other erections, placed by the defendants in the harbor of New York, and extending into said harbor and the Hudson river, about a mile from the New Jersey shore. It is claimed in the complaint, that said erections are within the limits and jurisdiction of this State ; and that the same are an obstruction to navigation, and are injurious to the public health, and were constructed without any lawful authority. The complaint sets up, as the basis of the plaintiff's claim to jurisdiction over the waters of the bay and river, a treaty or agreement made between the two States, in 1833, wherein and whereby the jurisdiction claimed, was conceded and yielded to this State. The complaint prays judgment for the abatement of such erections as a nuisance, and that the defendants be perpetually restrained by injunction from using and occupying said docks, wharves, and other erections ; and also from filling in with earth, stones, rubbish, timber, or other material, any part or portion of the waters of the said bay and of the Hudson river west of Manhattan Island, and for other relief. The defendants, declaring and insisting that the court had no jurisdiction of the persons of the defendant, or of the subject-matter of the action, or pretended cause of action set forth in the said complaint ; and that the same did not state facts sufficient to constitute a cause of action answer, setting up that they were a corporation, duly incorporated by the State legislature of New Jersey, and had under the authority of such State, acquired the right to make, fill in, construct and use the said railroad and docks, wharves, piers, and improvements, mentioned in the complaint ; and that all the lands occupied and used by them for the erection of said docks, wharves and improvements, were within the limits of the said State of New Jersey, and on the shore of said river and bay within her boundary ; and that the waters

upon so much of the lands of said bay as is occupied by said docks and wharves, was necessarily displaced for the purpose of such erections, and no more than was necessary for that purpose was so occupied. And they deny that said docks and wharves, and erections, do interfere with, or obstruct the navigation of said river or bay, but insist on the contrary that the same will benefit such navigation, and furnish increased facilities for such navigation; and deny that the said wharves and piers, and erections, are in any respect, public nuisances, and deny that the same are within the jurisdiction of this State; and insist that the plaintiffs have not correctly stated said treaty or agreement, so made between said States, and set out the same in full.

The cause was tried at a Special Term of the Supreme Court, held in and for the city of New York, by the Hon. JOSIAH SUTHERLAND, one of the justices of said court, who made and found, among other things, the following findings:

1. He found that on the 16th of September, 1833, an agreement was entered into between commissioners of the State of New York and commissioners for the State of New Jersey, in the language and terms set forth in the defendant's answer; and also that the same is also contained in volume 1st of the Revised Statutes of the State (5th ed., page 80), which agreement was duly ratified by congress and by the said States, and is now in full force and effect.

2. That the defendant, without any authority from the plaintiff, had taken possession of and appropriated to its own exclusive use a large extent of land located in the Hudson river, west of the middle of the waters of the Bay of New York and the Hudson river, and west of Manhattan Island, and south of Spuyten Duyvil creek, and had filled in and displaced the water and constructed and erected a bulkhead, extending east and west 2,400 feet at the south side, and 1,000 feet from north to south, with piers extending from said bulkhead easterly into the river over 400 feet in length and used the same as and for docks and wharves.

3. That said bulkhead, piers, and docks and wharves are

a little southerly of Jersey City wharf line, and are connected with the shore by a railroad, constructed by the defendants, of trestle work, filled in with dirt; and the distance from the east end of the bulkhead to the said shore is one mile and 105 feet, and that such railroad runs across that part of the bay south of Jersey City. That when said work was commenced in 1863, the depth of water at mean low water from the shore out to the bulk head, was from one foot and nine-tenths, which was the depth at the shore, to four feet and one-tenth; the middle of the way out it was four and one-tenth feet, and grew a little deeper as it went out; that the depth of water at mean low water, along the bulkhead at the south line, is now four and a half feet to twelve and four-tenths feet at the point where the piers begin; that the depth along the south pier is from twelve and four-tenths feet at the bulkhead to nineteen and nine-tenths feet at the easterly end; and of the north pier, from three and nine-tenths feet to nineteen and four-tenths feet at the easterly end. That such erections or obstructions are injurious to the navigation of the waters of the bay, by displacing so much of the waters out of the bay and river as they occupy, and that vessels ranging from twenty to thirty tons could navigate the bay where the water is three or four feet deep at low tide.

That such erections are encroachments upon and into the river and harbor, and are injurious to the interests of navigation and to the harbor of New York.

That the material used for filling up and making said railroad, wharves, &c., has been principally street dirt, including much animal and vegetable matter, which undergoes fermentation and gives out unwholesome and offensive odors to such an extent as to be injurious to health.

That the defendants are a railroad corporation duly organized under the laws of New Jersey, under which they have acquired title to the lands upon which said erections are made, and that the same are made by the defendants under the sanction and authority of the State of New Jersey.

That such erections have been placed upon lands purchased

by the defendant of the riparian owner upon the said bay, and that the said defendants have constructed the eastern terminus of their railroad and ferry houses and slips for the purpose of carrying passengers and freight to and from their railroad to the city of New York; that said ferry houses, piers and wharves are at the easterly end of said lands so occupied by the defendants, and the same are to the east of the exterior lines of the wharves in Jersey City, and west of the center of the Hudson river and of New York bay.

That in order to erect said structures said defendants have displaced so much of the waters of said bay as are necessary for that purpose and no more; and that said docks and piers, wharves and bulkhead are not extended further into said river than would be required for the use of a permanent ferry, such as is now used and conducted by the said defendants.

And the learned judge found as conclusions of law. That the State of New Jersey had no right or authority to authorize any person or persons to construct or erect any docks, wharves, piers or improvements beyond low water mark on the New Jersey side of said river and bay, south of Spuyten Duyvil creek, and west of Manhattan Island; and also, that the defendants had no right to make said erections when they were located within the navigable waters of the bay and river; that they are within the jurisdiction of the State of New York, and are infringements upon the rights of said State. That such erections are a common and public nuisance, and that it is the right and duty of the State of New York in protecting the interests of the people, and the commerce and navigation of the bay and river, to interpose and have the same abated by judicial proceedings. That for the reasons above stated, and as the materials used in filling up and making such erections are injurious to the public health, and in conflict with necessary sanitary regulations, the plaintiff is entitled to a perpetual injunction as prayed for in the complaint. And gave judgment accordingly, and for costs of the action.

From this judgment the defendants appealed to the General Term, in the first judicial district, where the same was

affirmed, and from this judgment the defendants have appealed to this court.

*Frederick T. Frelinghuysen* (*John C. Dimmick* with him), for the appellants, cited *U. S.* v. *Crosby* (7 Cranch, 115); *Clark* v. *Graham* (5 Wheat, 597); *Kerr* v. *Mason* (9 id., 566); *Holmes* v. *Remsen* (4 John. Ch., 460); *Hosford* v. *Nichols* (1 Paige, 220); *Chapman* v. *Robertson* (6 id., 627); Story Confl. Laws, §§ 551, 552; *Watts* v. *Kinney* (6 Hill, 82); 23 Wend., 484; 1 Chitt. Pl., 298, ed. of 1863; *Livingston* v. *Jefferson* (1 Brock., 203); *Gardner* v. *Ogden* (22 N. Y., 327); *Cumberland Coal Co.* v. *Hoffman Steam Co.* (30 Barb., 159); C. J. Marshall in Handly's *Lessee* v. *Anthony* (5 Wheat., 379); Vattel, lib. 1, ch. 22, § 278; 1 Black. Com., 116, 117; Harg. Law T., 17; Case of River Severn, Hargrave, p. 35; Angell on Wat., § 10, *et seq.;* *Corfield* v. *Coryell* (4 Wash., 385); *Bennett* v. *Boggs* (Baldwin's R., 72, 73); *Martin* v. *Waddell* (16 Peters., 367); Vattel Max., 3 B., 2 ch., 17; Wheeling bridge case, 13 How. U. S. 518; *New Jersey* v. *New York* (5 Peters., 284).

*Marshall B. Champlain*, attorney-general, and *Amasa J. Parker*, for the respondent, cited *Child* v. *Starr* (4 Hill, 375); Harg. Tr., 12; *Storer* v. *Freeman* (6 Mass. 435, 9); *Com.* v. *Charlestown* (1 Pick., 180); 5 Day, 22; Bouvier L. Dic. "Seashore;" *Child* v. *State* (4 Hill, 375, 6); *Ex parte* Jennings, 6 Cow., 547; 2 Pars. on Cont., 13 note *q;* *Varick* v. *Smith* (5 Paige, 137); 26 Wend., 404; *Browne* v. *Jamison* (8 Barb., 239, 241); *Com.* v. *Combs* (2 Mass., 489); *Morgan* v. *King* (30 Barb., 9); *People* v. *St. Louis* (5 Gilman, 351); cited 10 U. S. Dig., 239; 5 McLean, 425, 435; *Gibbons* v. *Ogden* (9 Wheat.); 1 Kent, 435, 438; *Steamboat Company* v. *Livingston* (3 Cow., 741); S. C. 1 Hopkin's R., 198; *Renwick* v. *Morris* (3 Hill, 621); S. C. 7 Hill, 575; *Wetmore* v. *Tracy* (14 Wend., 250); *Lansing* v. *Smith* (4 Wend., 21); *Com.* v. *Roxbury* (9 Gray, 519); *Drake* v. *Curtis* (4 Cush., 413); *Com.* v. *Alger* (7 Cush., 74, 89); *Boston* v. *Lecraw* (17

How. U. S., 433); *Dening* v. *Long Wharf* (25 Maine, 65); *Gerrish* v. *Union Wharf* (26 Maine, 392); *Kean* v. *Stetson* (5 Pick., 494, 5); *Gold* v. *Liston* (9 Humphrey, 369); 10 U. S. Dig., 339; 6 Mumford, 308; 2 Mass., 143; 1 Hawk. Pl. C. Book .C., ch. 76; 5 Humph., 363; 5 McLean, 437; 1 Stockton, 755, 788; 1 Dallas, 150.

E. DARWIN SMITH, J.   The protest with which the defendants commence their answer, wherein they declare and insist that the court had no jurisdiction over the person of the defendants or over the subject of the action or pretended cause of action. set forth in the complaint, and that the said complaint does not state facts sufficient to constitute a cause of action, presents the leading and controlling point upon which this action depends.

The voluntary appearance of the defendants in the action, gave the Supreme Court jurisdiction of their persons.   Their submission to answer, after their demurrer presenting the question of jurisdiction had been overruled, did not waive their right to raise the question afterward, that the court had no jurisdiction of the subject-matter of the action, and that the complaint did not state facts sufficient to constitute a cause of action.   (Code, section 148.)   The cause of action set forth in the complaint is clearly one of equitable cognizance; and as the jurisdiction of the Supreme Court is co-extensive with the boundaries of the State, it clearly had jurisdiction of such cause of action, if the place where the nuisances complained of were erected and existed was within the territorial limits of the State.

It is quite clear, that upon no other ground have the courts of this State any power, either in equity, or by indictment and criminal proceedings, to abate a nuisance.   The *locus in quo* must be within the legal limits of some county of the State, and the process for the abatement of such nuisance must go to the proper sheriff for execution, within the l    ~f his county.

Th  ~laim of jurisdiction over the *locus in quo,* and over

the subject-matter of the cause of action, as stated in the complaint, and asserted in the judgment at Special Term, and in the opinion at General Term, is confessedly based upon the agreement or treaty made between the States of New York and New Jersey in 1833.

Judge Ingraham, in the opinion at General Term, given upon the decision of the demurrer, when this question was distinctly presented to the court, said : " That the right " to maintain the action, " if it existed, is to be found in that agreement or treaty." The construction of this agreement, therefore, presents, for the consideration of this court, the principles upon which this action turns, and which involve the decision of the cause.

As, in the construction of all acts of the legislature, it is a cardinal rule to consider the cause, or object of making it, and the mischief sought to be removed or remedied ; so it will be expedient, I think, before proceeding to a discussion of this agreement or treaty, to consider the occasion which led to it, and the circumstances attending its execution and adoption by the State.

Before the making of this treaty or convention, this State claimed that its territorial limits, opposite the city of New York, extended to low water mark on the west shore or side of the Hudson river. In the first title of the first chapter of the Revised Statutes entitled, " Of the boundaries of the State," the description in tracing the line of the State eastwardly from the Delaware river, proceeds in the line of the forty-first degree of north latitude, till it reaches a *" rock on the west side of Hudson river ;* thence it runs southerly along the west shore at low water mark of the Hudson river of the Kill Van Kull, of the sound between Staten Island and New Jersey, and of Raritan bay to Sandy Hook," and including all the islands in the bay of New York.

The Montgomery charter of the city of New York, granted in 1730, also in bounding that city, runs the south line from " Red Hook, on the Long Island shore, across the North river so as to include Nutters' Island, Bedloe's Island, Rucking

Island and the Oyster islands, to *low water mark on the west side of the North river*, or so far as the limits of the province extend , then so to run up along the west side of the said river, at low water mark, until it comes directly opposite to Spuyten Duyvil creek." New Jersey, it clearly appears, did not assent to or acquiesce in this claim.

From a message of the governor of this State to the legislature, dated March 11, 1831 (*vide* Senate Documents of 1831, No. 55), and accompanying papers, it appeared that the State of New Jersey, in June, 1829, had commenced a suit in the Supreme Court of the United States against this State, claiming that "the said State of New Jersey was justly entitled to the exclusive jurisdiction and property of and over the waters of Hudson river, from the forty-first degree of north latitude, to the Bay of New York to the *filum aquæ* or midway of the said river, and to the midway or channel of said Bay of New York, and the whole of Staten Island sound, together with the land covered by the water of the said river, bay and sound in the like extent.

It appears from said message that New Jersey had also, in 1827, applied through commissioners to have the controversy, in respect to the boundary, submitted to the said Supreme Court, as an impartial tribunal, to arbitrate between the parties, which had been declined by this State; but finally in 1832, the legislature passed an act (*vide* Sess. Laws, chap. 6, p. 6), authorizing the governor to appoint three commissioners on the part of this State, to meet commissioners appointed or who might be appointed by the State of New Jersey, " to negociate and agree respecting the territorial limits and jurisdiction of the State of New York and the State of New Jersey."

The act further provided that the agreement duly made and signed by the commissioners should be binding on the State when confirmed by the respective legislatures, and approved by congress. The legislature of New Jersey passed a similar act, and the commissioners of the two States duly met and made and signed the agreement referred to, which was afterward ratified by the legislature of this State

and New Jersey, and approved by congress, the first article of which is as follows:

"Article 1. The boundary line between the two States of New York and New Jersey, from a point in the middle of Hudson river, opposite the point on the west shore thereof, in the forty-first degree of north latitude, as heretofore ascertained and marked to the main sea, shall be the middle of the said river, of the Bay of New York, of the waters between Staten Island and New Jersey, and of Raritan bay to the main sea, except as hereinafter otherwise particularly mentioned."

The language of this article is certainly very clear and explicit. Aside from the *exception* at its close, it leaves no room for constructive doubt or misconstruction in regard to its meaning or effect. It fixes definitely the boundary line between this State and New Jersey at or in the middle of the Hudson river, and of the Bay of New York, and of the waters between Staten Island and New Jersey, and of the Raritan bay to the main sea. It relinquished, in legal effect, whatever right or claim this State formerly had to the bed of the Hudson river between Manhattan and Staten Islands, and low water mark on the Jersey Shore. In this particular it yielded the precise point in controversy with that State; for, as is said by the attorney-general of this State in a statement of the case, communicated by Governor Throop with his message to the legislature above referred to, "the principal prayer of the bill," referring to the bill filed by New Jersey in the Supreme Court of the United States, and served upon the governor and the attorney-general of this State, "is that the eastern boundary line between your complainants (the State of New Jersey) and the State of New York may, by the order and decree of this honorable court, be ascertained and established, and the right of property, jurisdiction and sovereignty of your complainants to the *filum aquæ* or middle of said Hudson river, from the forty-first degree of north latitude on the said Hudson river, through the whole line of the eastern shore of the State of New Jersey, as far as said

river washes and bounds the said State of New Jersey, down to the Bay of New York, and to the channel or midway of said bay, and all the waters lying between the New Jersey shore and Staten Island."

The boundary line, it appears, is thus established between the two States, precisely as prayed for by New Jersey in the said bill of complaint, at and in the middle of the Hudson river and other waters therein mentioned.

This article does not profess to convey, grant or relinquish any rights on the part of either State. It simply declares that the boundary line between the two States at the place, &c., "shall be the middle of the said river," &c.

Whatever doubt may have existed before upon the subject, immediately upon the adoption and ratification of this convention or treaty, the sovereignty and jurisdiction of the respective States extended and attached to that portion of the said river and other waters assigned to each State respectively by said article up to the line of the boundary therein fixed and established.

All doubt or conflict in respect to the territorial limits or boundary of the respective States, so far as the same relate to or affected the Hudson river and the Bay of New York, and other waters therein mentioned, was and is thus removed and extinguished.

This establishment of the boundary line between the two States clearly left and fixed the *locus in quo*, the place where the nuisances complained of in this action and sought to be abated thereby are erected and situated, within the undoubted territorial limits and boundaries of the State of New Jersey.

This view in respect to the *locus in quo* of said nuisances and of the subject-matter of this action seems necessarily to be conclusive, and require a reversal of the judgment below and a dismissal of the complaint, unless the jurisdiction of the court can be sustained upon other grounds.

The next inquiry in order, I think, on this question, relates to the exception at the close of the said first article in these words: "Except as herein otherwise particularly mentioned."

The next article in said treaty is as follows:

Article 2. "The State of New York shall retain its present jurisdiction of and over Bedloe's and Ellis Islands, and shall retain exclusive jurisdiction of and over the other islands lying in the waters above mentioned, and now under the jurisdiction of that State."

This article fulfills the office of an *exception*, as it takes out something embraced in the general description, and which would otherwise be granted, and explains and gives point and force to this exception in article first. These islands are situate west of the boundary line fixed by the first article of the said convention, and would have passed to New Jersey without this exception. The first article simply fixes the boundary line between the States, and this exception takes from the territory thus assigned to New Jersey, these islands, and limits and restricts the boundary line, so far as the same would otherwise give them to New Jersey.

This second article, therefore, ratifies this exception in the first article, and gives it full force and effect. The right of absolute sovereignty, which includes all the power of government, all the authority, executive, judicial, and legislative, which the several States possess and exercise, subject to the constitutional supremacy of the national government, doubtless belongs to New Jersey, over the domain and territory of said State. This right of governmental control may doubtless be modified by compact between the States. And this brings us to the inquiry, how far, if at all, the State of New Jersey had made a binding provision by treaty for the cession and extinguishment of any of her territorial or governmental rights to the State of New York, over the waters or land referred to in said treaty. When these commissioners for the two States had thus fixed and established the boundary line between the two States, as fixed and defined in said first and second articles of said treaty, they doubtless clearly saw that their work was unfinished. The act for the appointment of said commissioners passed by this State, empowered them to negotiate and agree respecting the territorial limits

and *jurisdiction* of the State of New York and the State of New Jersey; and the act for the appointment of commissioners by New Jersey, is entitled "an act for settlement of the territorial limits and *jurisdiction* between the States of New Jersey and New York," and I presume contains similar powers.

But whatever may have been the powers conferred by these acts on the commissioners, and it is now a matter of no consequence, since their agreement or treaty has been confirmed by both the State legislatures and ratified by congress, the commissioners doubtless consider that under the authority to agree respecting "*the jurisdiction between these States*," they were authorized to agree upon, and determine the mode in which the said States should exercise, use and enjoy their respective rights into and upon, and over the waters of the said river and bay, through the center of which they had just, in said first article, run an imaginary line, fixing the boundary between said States, and how the vast domestic and foreign commerce, which then covered, and was destined in the future to crowd and cover these waters, might be best protected, controlled and governed, without conflict between the authorities of said States, or between the citizens thereof.

It is quite apparent, I think, that they well and wisely considered that the necessities of the case, the welfare of these States, the exigencies of commerce, and the interests of the city and port of New York in particular, in whose prosperity, as the commercial metropolis of the country, New Jersey had, in a large degree, a common interest, required that there should be a unity of control over said waters, and a single and exclusive jurisdiction exercised over them by one of the said States. And this control or *jurisdiction*, in the language used in that treaty or agreement, was very properly conceded to this State in the following article:

Article 3. "The State of New York shall have and enjoy exclusive jurisdiction of and over all the waters of the Bay of New York, and of and over all the waters of Hudson river lying west of Manhattan Island and to the south of the mouth of Spuyten Duyvil creek, and of and over the lands

covered by the said waters to low water mark on the westerly or New Jersey side thereof, subject to the following rights of property and of jurisdiction of the State of New Jersey." This provision in the treaty most clearly and distinctly gives and grants to, and vest in the State of New York, full, complete and undoubted control, government and jurisdiction of and over all the waters therein mentioned. Such was the clear intent and purpose of this provision; and, so far as it was essential to the proper exercise of such jurisdiction, it gives a control also of and over the land covered by such waters. It doubtless was designed in the clause of said provision in these words: "Of and over the lands covered by the said waters to low water mark," to disembarrass the jurisdiction so conferred over the said water, from all pretense of right to interfere therewith arising from the legal maxim, that the owner of the soil owned all above it, "*cujus est solum, ejus est usque ad coelum*." So that the jurisdiction over the *water* should be absolute and unquestioned for all practical purposes.

It clearly could not have been the intention in these words to re-cede to New York what had just been relinquished in respect to the boundary between the two States in the first article or to nullify the force of such article; for it declares expressly that the rights over the water so granted were subject to the rights of property and of jurisdiction of the State of New Jersey, following:

1st. That the State of New Jersey shall have the exclusive right of property in and to the land under the water lying west of the middle of the Bay of New York, and west of the middle of that part of Hudson river which lies between Manhattan Island and New Jersey.

2d. That the State of New Jersey shall have exclusive jurisdiction of and over the wharves, docks and improvements made and to be made on the shore of said State, and of and over all vessels aground on said shore, or fastened to any such wharf or dock, except that the said vessels shall be subject to the quarantine or health laws, and laws in relation to

passengers of the State of New York, which now exist or which may hereafter be passed.

3d. The State of New Jersey shall have the exclusive right of regulating the fisheries on the westerly side of the middle of said waters, provided that the navigation be not obstructed or hindered.

These provisions clearly show that it was not the intention of New Jersey, in giving jurisdiction to New York over the *waters* of such State, to relinquish any of the important rights of property which were acquired by or conceded in the first article of the said treaty.

The whole object of New Jersey in making the treaty, and the whole point of the controversy between the States, so far as that State is concerned, would be defeated by a construction of the treaty which involved such a consequence.

Under the claim previously made by this State to the title to low water mark on the New Jersey shore, this State, if such claim had been conceded or established, would have had the right to control all erections and improvements on the New Jersey side of the river below low water mark, and would necessarily have had complete governmental authority and jurisdiction to that point. The proprietary rights of New Jersey would have ended at low water mark, and that State would have been practically excluded from the Hudson river and the bay, and debarred all right to erect wharves, piers or other improvements upon the sea shore, except by leave and license first obtained from this State.

It was this very claim and the legal rights and conse-quences resulting from it, if allowed, which New Jersey had long resisted. This was in legal effect renounced and aban-doned by this State in the first article of said treaty; and New Jersey as a sovereign, independent, co-equal State, acquired thereby, if she did not before possess, all the rights of pro-prietorship in said river and bay west of the center thereof possessed by this State east of the same center line.

Certainly this third article could not have been intended, whatever may be its legal effect or construction, to restore to

this State rights so long and so earnestly and persistently claimed by New Jersey, and thus so formally renounced by this State in the first article of said treaty. These three subdivisions or provisions of this third article seem to me to have been entirely unnecessary. The giving of jurisdiction to this State over the waters of said river and bay did not imply jurisdiction over the land covered by such waters, much less of land upon the shore not covered by water; but these provisions were doubtless inserted for greater caution, to exclude all claim or ground for claim to that effect, and to save all misunderstanding in the future on that subject. They show that nothing in the shape of property was granted or yielded to New York, or intended to be in any way parted with, or surrendered by New Jersey. The right in respect to the fisheries is expressly excepted and reserved as a State right, which pertained in public waters to the citizens of the State, so far as the same was capable of private use or of State appropriation.

The provision that the State of New Jersey shall have exclusive jurisdiction of and over the wharves, docks and improvements made and to be made on the shore of said State, is an unqualified assertion in the compact, that the right to build, construct and repair and maintain wharves and docks, piers and other erections and improvements on the shore of New Jersey was a right of property retained and reserved as appurtenant to the soil of the State and to the proprietorship of the bed of the river and bay, and involves and includes a declaration that complete jurisdiction and control over the whole subject of wharves and docks on the shore of said river and bay belongs to the said State of New Jersey. The word "shore" is obviously used in this provision in a general sense, as equivalent to side or margin of the river and bay, and not in the strict sense as applicable to the particular space between high and low water mark, as is its meaning when applied to the land at the edge or border of the sea or arm of the sea where the tide ebbs and flows.

But it is preposterous to suppose that these wharves and

docks, referred to in said article, were to be constructed upon
the dry land, remote from the water, or above low water
mark.   As with the wharves then erected and in use con-
tiguous to said waters, so the wharves and docks thereafter
to be made and erected were doubtless to be constructed
below low water mark, and to extend sufficiently far into the
deep water of the river or bay to answer the ordinary pur-
poses for which such erection was made.

The care taken to provide that, under the concessions of
jurisdiction over the waters of said river and bay, no right
should exist or be exercised upon the *land* or over the soil of
New Jersey upon the shore or over the bed of the river or
bay, and to exclude every pretence for any such claim or right
is particularly shown in the provision, that New Jersey should
have exclusive jurisdiction of and over all vessels aground on
the shore of said State, or fastened to any wharf or dock on
such shore, except that the said vessels shall be subject to the
quarantine or health laws and laws in relation to passengers
of the State of New York, which now exist, or which may be
hereafter passed.

This provision, and particularly the language of the *excep-
tion*, seem to me to be the key to this whole compact, so far
as it relates to this question of jurisdiction.

Confessedly, vessels afloat upon the waters of the bay or
the river are, and were intended to be subject to the exclusive
jurisdiction of New York; but whenever they were fastened
to any wharf or dock upon the New Jersey shore, or were
aground upon said shore, they became attached to the soil of
New Jersey, and were under her exclusive jurisdiction.

The moment they became thus affixed to the land of New
Jersey in the bed of the river or on the shore, the jurisdiction
of New York over them was to cease, except in the language
of said proviso : " They shall be subject to the quarantine or
health laws, in relation to passengers, of New York."

This exception explains the object and nature of the juris-
diction intended to be given to New York.   It was to be a
police jurisdiction of and over all vessels, ships, boats or craft

of every kind that did or might float upon the surface of said waters, and over all the elements and agents or instruments of commerce, while the same were afloat in or upon the waters of said bay and river for quarantine and health purposes, and to secure the observance of all the rules and regulations for the protection of passengers and property, and all fit governmental control designed to secure the interests of trade and commerce in said port of New York, and preserve thereupon the public peace.

By this exception, it was designed that vessels afloat upon said bay and river should not escape or evade the quarantine laws, and the laws relating to passengers of New York, by coming to anchor on or near the New Jersey shore, or by becoming attached to the wharves or docks on said shore or adjacent thereto, but in all other particulars they were left subject to the laws of New Jersey.

The next article in the agreement, article 4, shows the character of the jurisdiction designed to be given to this State, over these waters quite distinctly. It is as follows:

" Article 4. The State of New York shall have exclusive jurisdiction of and over the waters of the Kill Van Kull, between Staten Island and New Jersey, to the westernmost end of Shooters Island in respect to such quarantine laws, and laws relating to passengers as now exist or may hereafter be passed under the authority of that State, and for executing the same; and the said State shall also have exclusive jurisdiction for the like purposes of and over the waters of the sound from the westernmost end of Shooters Island to Woodbridge creek, as to all vessels bound to any port in the said State of New York."

The remaining articles of said agreement, all fairly considered, conduce to the same construction, and confirm the view that the jurisdiction conferred upon this State over the waters of said river and bay was a qualified and limited jurisdiction conferred for police and sanitary purposes, and to promote the interests of commerce in the use and navigation of said waters, and was not designed to confer or create control

over the lands or domains of New Jersey, or to give to this State any right to interfere with her complete political or governmental jurisdiction as a sovereign State of and over her own soil, and its appurtenances, and of and over every description of property of any appreciable value within her territorial limits.

The 5th article contains the same provisions in substance contained in the third in respect to all the waters of the sound between Staten Island and New Jersey, lying south of Woodbridge creek, and of and over all the waters of Raritan bay, west of a line drawn from the light-house at Princess bay to the mouth of Mattewan creek, and confers exclusive jurisdiction over such waters upon the State of New Jersey, subject to the same rights of property and jurisdiction of New York, over wharves and docks, and the right of regulating the fisheries between the shore of Staten Island and the middle of said waters, as is contained in the said third article in respect to the same subject over the waters therein mentioned.

Articles 6 and 7 of said treaty give to said States equal concurrent jurisdiction over all of said waters for the service of criminal process issued under the authority of either State against any person accused of any offence committed in such State, or on board of any vessel being under the exclusive jurisdiction of such State, or committed against the regulations made or to be made by either State in relation to the fisheries mentioned in the 4th and 5th articles of said treaty, and of civil process issued against any person domiciled in either State, or against property taken out of either State to evade its laws; but such process was not to be served upon or on board of any vessel aground upon, or fastened to the shore of either State, or fastened to a wharf adjoining thereto.

These articles, I think, properly interpreted, concur in showing that it was the intention of this treaty, that both States should retain the absolute control of and over its own soil, and over everything annexed or attached to it, and over every ship, vessel, or other floating craft attached to any

wharf or pier, or located in any dock upon its shore, or aground in the waters adjoining its shore, and of and over all persons living or being upon such wharves or vessels, and the property therein; and that each State intended to throw the shield of its State law, and State sovereignty, over all such ships, vessels, persons and property.

A crime committed upon any vessel fastened to any wharf on the shore, or upon any vessel aground in the waters adjoining the shore of New Jersey, and west of the center of said river or bay, except those offences specified in the said third article against the quarantine or health laws, and the laws in relation to passengers of New York, would be, I think, clearly an offence against the peace and dignity of New Jersey, cognizable exclusively in her courts, and as much so, as if said offence had been committed inland and within her unquestioned bounds.

And this consideration seems to me conclusively to dispose of this case, so far as the nuisance complained of relates to the public health, and to the materials used in filling up and making the erections complained of, for such nuisance is a misdemeanor indictable at common law in the criminal courts of the county where it is located, and it seems to me quite clear, that the persons engaged in erecting or maintaining, or continuing said nuisance thus, if the finding is true, necessarily affecting the public health of the people of New Jersey, and particularly of the inhabitants of its neighboring city of Jersey City, and of its vicinity, could not be lawfully indicted and convicted in the city and county of New York, for the erection and continuance of such nuisance, or elsewhere than in the proper county where such nuisance existed in the said State of New Jersey.

But in the finding of fact of the learned judge at Special Term, it is found that the erections complained of are an encroachment upon and into the said harbor and river. And, as matter of law, it was also found "that the said erections were a common and public nuisance, and that it is the right and duty of the State of New York in protecting the

interests of the people, and the commerce and navigation of the said bay and river, to interpose and have the same abated by judicial proceedings. Upon the facts, it is difficult for me to see how erections extending from the land on the shore over flats covered with shallow water, ranging from one and nine-tenths feet, to four and one-tenth feet deep, and extending into the river and bay simply far enough to meet navigable waters, and no further than these " would be required," as the fact is found, "for the use of a permanent ferry," such as is now constructed and in use, could be an injury to navigation and commerce upon said waters. To call such erections, made in the manner and for the purpose stated, a nuisance seems to me an entire misnomer, and that such erections, instead of being a nuisance and injurious to commerce and navigation, are really works and improvements, adapted, as they were obviously designed, to promote and facilitate trade, commerce and navigation.

I can conceive of no value in the waters of this bay and river to these States as navigable waters, if they are not to be used, and may not be approached on either side by wharves and piers, and other erections, extending from the land sufficiently far into the same to reach the navigable waters thereof, and thus connect and allow intercourse and trade between the land and vessels upon the water. But assuming, as I suppose we must, that this finding upon the facts is to be unquestioned here, and it is doubtless conclusive upon this court, so far as the court below had power to adjudicate upon the question, and that such erections are obstructions, and injurious to the navigation of the waters of said bay and river, still such finding cannot transfer the *locus in quo* of such nuisance from the State of New Jersey to this State.

The finding can have no further force than as a finding that such erections and extensions from the land on the New Jersey side of the river and bay are nuisances, as affecting the general and common use of such river and bay as public navigable waters. Upon this finding, the original question recurs ·

is such nuisance within the legal and governmental jurisdiction of this State?

It is part of the argument of the learned counsel for the people that the exclusive jurisdiction of New Jersey over wharves, docks and improvements upon her shore, does not attach till such wharves, docks and improvements are constructed, and that New York has the exclusive right to decide what and when and how such erections shall be made.

This argument I think entirely unsound and untenable, as I have endeavored to show, and that the jurisdiction of New Jersey over wharves, docks and improvements on her shore extends to and embraces the whole subject of wharves, docks and improvements, and includes the power to prescribe when and where and how they shall be erected, and to exercise all the control over them that government can possess over the property of its citizens.

But it is insisted by the counsel for the plaintiff, " that inasmuch as New York has the exclusive political jurisdiction, the exclusive charge and regulation of navigation, and the exclusive right to legislate on that subject, or to act upon it through its public authorities, the exclusive right to decide what is an obstruction belongs to New York."

This is simply an assertion of a claim that, in a controversy virtually between these two sovereign States in regard to their relative rights, the courts of this State are entitled to decide the question conclusively in our own courts; that is, one party to a controversy has the jurisdiction and the right judicially to determine the question in dispute. These erections had been made under the authority of the State of New Jersey. That State, through the parties called into court in this action, denies the jurisdiction of the courts of this State; denies the fact of the nuisance, and insists that the erections in question are proper and lawful improvements, erected upon her own shore and land to enable her citizens to participate in the commerce of the world in the common use of the navigable waters between the States.

The argument to sustain the jurisdiction of our courts upon

the basis urged by the plaintiff's counsel, it seems to me, is
entirely untenable and in conflict with the fundamental princi-
ple of law and justice, that no party shall be judge in his own
cause. If these erections are really a public nuisance, affecting
the navigation and use of these great public waters between the
two States, situate and erected as they clearly are within the
territorial limits of the State of New Jersey, it ought certainly
to be presumed, until the contrary appeared, that that State
would protect its own interests and the interests of the coun-
try and of the commercial world in such waters by abating
such nuisance in due time through its own judicial tribunals.

But if it appears by any judicial act or decision, that such
nuisance was maintained by the authorities of that State,
and that the courts of that State had failed to do their duty
in abating them upon proper proceedings for that purpose,
certainly such facts would not constitute a basis or ground
upon which the courts of this State could assert and maintain
its jurisdiction for the abatement of such nuisances.

The jurisdiction asserted for this State really belongs to the
general government. In the case of the *State of Pennsyl-
vania* v. *The Wheeling Bridge Company and others* (13 How.
U. S., 579.) Chief Justice TANEY, said : " The Ohio being a
public navigable stream, congress has undoubtedly the power
to regulate commerce upon it. They have the right to pro-
hibit obstructions to its navigation ; to declare any such
obstruction a public nuisance, and to direct the mode of pro-
ceeding in the courts of the United States to remove it, and
to punish any one who may erect or maintain it ;" and this case
and the case of the *State of New Jersey* v. *This State* (5
Peters, 284), show that, in the absence of such legislation by
congress, the proper court of the United States has ori-
ginal jurisdiction in equity over controversies between
States, and over nuisances affecting public navigable waters
within the limits of the Union. But this is another, and it
seems to me an unanswerable argument against the claim of
jurisdiction over these erections asserted in the judgment
and decision rendered at the Special Term (and which it is

due to the learned judge who tried the cause, to say, was rendered in obedience to the decision of the General Term from which he dissented), that the court has no power to enforce such jurisdiction or carry such judgment into effect. The judgment directs, orders and adjudges that the said defendants do remove the said erections, bulkhead, piers, wharves and railroads, and earth, stone, dirt, animal and vegetable matter and other materials of which they are composed, and restore the said river and bay to the condition in which it was before said erections were made, within one year after service on the defendant's attorney of a copy of the said judgment; and in case the said defendant shall fail to make such removal as aforesaid, the sheriff of the city and county of New York is thereby directed to remove the same and to abate said nuisance."

The defendants are a corporation organized under the law of New Jersey, and must be deemed non-residents of this State. This judgment, therefore, cannot be enforced by process of attachment and proceedings as for a contempt, as against citizens of this State. Such an attempt and proceeding would obviously prove utterly abortive. But the mode of enforcing this judgment in default of the defendants to remove said erections is prescribed in the judgment itself. It directs the sheriff of the city and county to remove the same and abate said nuisance.

Can the Supreme Court protect its officer and punish all persons resisting him in the execution of this judgment? Most clearly I think it cannot.

A judgment that imposes such duties, and subjects a public officer to the perils incident to, and which will obviously attend the attempt to enforce it, cannot be a lawful and valid judgment; must be utterly void for want of jurisdiction in the court to render the same.

The judgment below should therefore be reversed; and, as it clearly appears that a new trial could not change the essential facts of the case, the complaint should be dismissed with costs.

EARL, Ch. J. (dissenting.)   Prior to 1833 there had been, for many years, a dispute between the States of New York and New Jersey as to the boundary line between the two States.   The State of New York had always claimed the boundary line to be at low water mark on the westerly side of the water, between the two States, and New Jersey had disputed this boundary, claiming that the center line of those waters was the general boundary.   The claim of the State of New York was not so emphatically asserted, prior to 1830, as in that year.   In the Montgomery charter of the city of New York, granted in 1730, the city was bounded, beginning at the mouth of Spuyten Duyvil creek, on the Westchester side thereof, at low water mark, and running on the Westchester side, at low water mark, to the East river, and so on around the easterly side of the city to the southerly end thereof; and "from thence across the North river, so as to include Nutter's Island, Bedloe's Island, Bucking Island and Oyster Island, to low water mark on the west side of the North river, *or so far as the limits of the province extends*, and so to run up along the west side of the river, at low water mark, *or along the limits of the province*, until it comes opposite to the creek aforesaid, and thence to the place of beginning."   In the act, passed April 3d, 1801, entitled "an act to divide this State into counties," the westerly boundary of the county of New York is described in the same language as contained in the Montgomery charter; and the county of Westchester is bounded "westerly by a line running from thence down the middle of Hudson river until it comes opposite to the bounds of the State of New Jersey on said river; thence west to the same (west *from the middle of the river*); thence southerly along the east boundary line between this State and the State of New Jersey, to the line of the county of New York," &c.   In the act passed March 26th, 1813, the boundaries of the counties of New York and Westchester are described in substantially the same way.

It will thus be seen, that while the State of New York apparently asserted her claim to a boundary line at low water

mark on the west side of the Hudson river, yet she did it
in such terms as to show that the boundary was in some dis-
pute and uncertainty.    Chancellor KENT, in his work on the
charter of the city of New York, page 122, says: "Every
revision of our statute laws contained this same boundary
line, as the limit and jurisdiction of the city, and with the
same reservation as to the west bounds on the Hudson river,
and leaving the west bounds of the State along the city line
in uncertainty."    But in 1830, at the adoption of the Revised
Statutes (1 R. S., 61), the claim of New York was unequivo-
cally asserted to low water mark on the New Jersey side of
the waters dividing the two States.    The reasons for making
this claim at that time are fully stated by the revisors in their
first note.    This assertion of title on the part of the State
of New York, thus emphatically made, attracted the atten-
tion and aroused the opposition of New Jersey, and led to
the appointment of the commissioners by the two States in
1833, who made the agreement as to the boundary and juris-
diction of the two States, the construction of which is
involved in this action.    At the time this agreement was
made, New York was a large and flourishing commercial
city, with the finest port, and destined to be one of the largest
commercial emporiums in the world, while New Jersey had
no commerce, no commercial port, and no brilliant commer-
cial prospects.    The commissioners met to settle a boundary
that had been in dispute for 150 years, and the agreement which
they concluded, giving neither party all it claimed, was the
result of a compromise.    In adjusting this compromise, in their
efforts on both sides to secure rights which they deemed impor-
tant, the learned and able commissioners, either from the force
of circumstances or because we cannot see all the facts which
they contemplated, used language which leaves their inten-
tion in some respects somewhat in doubt.    In construing
this agreement, we must arrive at their intention by consider-
ing the circumstances by which they were surrounded, the
objects which they had in view, so far as we can discern them,
and the meaning of the language which they have used.

Article 1, reads as follows: "The boundary line between the two States of New York and New Jersey, from a point in the middle of Hudson river, opposite the point on the west shore thereof, in the forty-first degree of north latitude, as heretofore ascertained and marked, to the main sea, shall be the middle of the said river, of the Bay of New York, of the water between Staten Island and New Jersey, and of Raritan bay, to the main sea, *except as hereinafter otherwise particularly mentioned.*"

It is important to inquire what comes within this exception, and thus controls the boundary as otherwise established in the first article. On the part of the defendant it is claimed that this exception has reference only to, and that the inquiry is fully answered by the second article. It seems clear to me that this is not the true construction. If that was all that was intended to be excepted, it could and most likely would have been inserted in the first article, thus making that article complete as to the boundary between the two States. It could have been added, instead of the exception now contained, as follows: "Except the State of New York shall retain its present jurisdiction of and over Bedloe's and Ellis Islands, and shall also retain exclusive jurisdiction of and over the other islands lying in the waters above mentioned, and now under the jurisdiction of that State." If the exception was intended to apply only to these islands, it would have been more orderly and precise to have inserted it thus in the first article, than to have used a second article, without any apparent reason, to contain the exception, necessarily leaving it in great doubt, to say the least, whether any more exceptions were meant or not. The plain, obvious and natural meaning of the words "except as hereinafter otherwise particularly mentioned," requires us to hold that they have reference to anything and everything thereafter particularly mentioned in the agreement, in any way modifying the boundary as established in that article. The third article of the agreement then, also modifies the boundary line as mentioned in the first article, by providing that the State of New

York " shall have and enjoy exclusive jurisdiction of, and over all the waters of the Bay of New York; and of and over all the waters of Hudson river, lying west of Manhattan Island, and to the south of the mouth of Spuyten Duyvil creek; and of and over the lands covered by the said waters to the low water mark on the westerly or New Jersey side thereof." If there was no more than this, and the agreement stopped here, there could be no question, it seems to me, that the boundary line between the two States would be at low water mark on the New Jersey side of the bay, and of the Hudson river south of the mouth of Spuyten Duyvil creek; and the boundary as contained in the first article, would be thus far modified, leaving it in full force as to all other parts of it south of the mouth of Spuyten Duyvil creek, and as to all the line north of that, for several miles to the westerly end thereof in the forty-first degree of north latitude. The jurisdiction is "exclusive," thus forbidding the exercise of any jurisdiction within the prescribed limits by the State of New Jersey. It is claimed on the part of the defendant, that the word "jurisdiction" is here used in a limited sense. I cannot doubt that it was used in the sense of sovereign, governmental jurisdiction. When used in reference to the jurisdiction of a State or government, it means "the power of governing or legislating;" "the power or right of exercising authority." When used in reference to courts, it means " the power of executing the laws and distributing justice." (See Webster's Dic.) It is used in the former sense in section 1 of the fourteenth amendment of the national constitution: " All persons born or naturalized in the United States, and subject to the *jurisdiction* thereof," &c. It was used in the same sense in the following acts of the legislature of this State passed at an early day: " An act to cede jurisdiction of certain lands on Montauk Point to the United States of America for the purpose therein mentioned," passed in 1792. "An act to prevent intrusion on lands within the jurisdiction of this State under pretense of title from the State of Connecticut," passed in 1796: " An act to cede the

jurisdiction of certain lands in this State to the United States," passed in 1798: " An act to preserve and support the jurisdiction of this State," also passed in 1798: " An act to cede to the United States the jurisdiction of certain islands situate in and about the harbor of New York," passed in 1800, embracing Bedloe's Island, Oyster Island and Governor's Island. By an act passed April 1, 1800, certain lands on Staten Island were granted to the United States ; but it was provided " that such grant shall expressly reserve the jurisdiction of this State." These illustrations of the use of this word are taken from a single volume of statutes now before me, and are sufficient for my purpose. This word is used in the same sense every time it is used in this agreement. New York had always exercised exclusive,sovereign, governmental jurisdiction over the islands in the waters between the two States, and this jurisdiction is not *conferred* upon her, but is *retained* by her in the second article. It is used in the same sense in the act of congress passed June 25, 1834, consenting to the agreement, wherein it is provided that nothing in that act shall impair the *jurisdiction* of the United States over the islands belonging to it, and over the waters forming the subject of the agreement.

It is quite clear, then, that if there was nothing more of the third article than I have quoted, it could not be seriously questioned that the sovereign, political and governmental jurisdiction of the State of New York extended to low water mark on the New Jersey shore westerly of the waters mentioned. And that the boundary named in the first article was so far modified. But it is provided that this exclusive jurisdiction shall be subject to certain rights of property and jurisdiction of the State of New Jersey. It is first provided that " the State of New Jersey shall have the exclusive right of property in and to the land under water lying west of the middle of the Bay of New York, and west of the middle of that part of the Hudson river which lies between Manhattan Island and New Jersey." Why was this provision necessary, if the boundary line remained in the middle of the bay and

river and was not moved west of the middle to low water
mark by the exclusive jurisdiction previously conferred in the
same article ? By this provision, simply, *property* is given to
New Jersey, and the governmental jurisdiction and authority
of New York is not interfered with. New Jersey owns the
fee of this land in no other sense than if the land was situated
in the center of this State. She owns it as a proprietor, in
the same sense in which the United States owns the lands on
Staten Island, by virtue of the act above quoted, passed April
1, 1800, the governmental jurisdiction remaining in the State
of New York. This provision, then, does not affect the
boundary between the two States, but simply gives New Jer-
sey certain rights of property within the State of New York.

It is next provided that " the State of New Jersey shall have
the exclusive jurisdiction of and over the wharves, docks and
improvements made and to be made on the shore of the said
State, and of and over all vessels aground on said shore, or
fastened to any such wharf or dock; except that the said ves-
sels shall be subject to the quarantine or health laws and laws
in relation to passengers, of the State of New York, which
now exist or which may hereafter be passed." This was a
jurisdiction to be carved out of the exclusive jurisdiction
previously given to the State of New York; and except as
modified by this, the exclusive jurisdiction of the State of
New York was to remain. The important question in this case
is to determine how far the exclusive jurisdiction of the State
of New York is modified by this clause in the agreement.
In discussing this question, I shall assume that the word
" shore," as here used, does not mean the space between high
and low water mark, but that it means, as claimed on the
part of the defendant, the space between low water mark and
a line far enough out into the water for all the purposes of
docks, piers and wharves. At the date of this agreement,
certain docks and wharves had already been made on the
New Jersey side, and it was foreseen that others might there-
after be needed and be made. New Jersey had but little
commerce and no important city or seaport upon these waters

New York city then controlled by far the largest share of the commerce of this country, and these waters were mainly important as her seaport. It was important that this port should be subject to but one State jurisdiction, and that its jurisdiction should be of the State possessing the city of New York, and having by far the largest interest in regulating, protecting and governing the port. It was clearly the intention of the commissioners, as gathered from the whole agreement, to place that port under the exclusive jurisdiction of the State of New York, so that she could control and regulate it in the interest of her great commerce and her great commercial city. While it was agreed that New Jersey might regulate the fisheries west of the middle of the said waters, yet she was bound to do it in such way as not to hinder or obstruct navigation. So jealous was New York as to encroachments upon her harbors that she would not even intrust the State of New Jersey with this right to regulate fisheries, except with a provision that navigation should not be obstructed or hindered. To uphold the claim put forth by the defendant, while New York was thus jealous of her port, it must be held that she yielded to New Jersey the unlimited and absolute right to make wharves, docks and other improvements below low water mark on her shore, without any proviso or limitation. As the wharves and other improvements would necessarily be connected with the main land, it was appropriate that New Jersey should have absolute jurisdiction over them when made, and not at all important that New York should have for the interest of her commerce, for the government of her great city, or for any of the purposes of her great port. But when it is proposed to encroach upon the waters with new wharves and improvements, then it was important for New York to intervene and be consulted. Hence the jurisdiction of New Jersey was confined to the docks, wharves and improvements then made, and such as thereafter might be made; and no right or authority was conferred upon her to make any, or authorize any to be made. Whenever it is attempted to make any

new ones, the jurisdiction of New York is involved, and before they can be legally made, her consent must be obtained. The result is that no wharves can be legally and rightfully made on the New Jersey side, below low water mark, without the authority of New Jersey, as the proprietor of the land, and without the consent of New York, which has jurisdiction over both the land and water. This result is reached by giving the natural and plain meaning to the language used, and keeping in view the primary object sought in this part of the agreement, to place the port of New York under the control of New York. The boundary line named in the first article is modified in the same way by the fifth article, as to the waters therein mentioned, and for substantially the same reason. Those waters did not form a portion of the port of New York, and properly belonged to the port of Perth Amboy, which we are told by the learned counsel for the defendant, the people of New Jersey hoped might some day become a great commercial metropolis. Hence these waters were placed under the exclusive jurisdiction of New Jersey, that she might have the exclusive control of that port.

The construction which I have thus given to this agreement gives full force and effect to all parts of it and harmonizes all its provisions. But if we should so far do violence to language as to hold that "the exclusive jurisdiction" given to the State of New York was, after all, as claimed on the part of the defendant, merely a "police" jurisdiction, what would be meant by that? Certainly not merely the right to serve process and make arrests, because that is provided for in the seventh article. *Police* means "the government of a city or town," "the administration of the law and regulations of a city," "the internal regulations and government of a kingdom or State." (See Webster's Dic., Jacob's Law Dic., Tomlin's Law Dic.) And a police jurisdiction would mean the right to regulate and govern a city or State. Hence, if it be held here that New York has, by virtue of the third article in this agreement, only a police jurisdiction, it certainly would be broad enough to abate within that jurisdiction, what the Court

at Special Term has found to be a public nuisance.    To abate nuisances is one of the ordinary incidents of police jurisdiction. Hence, it would not help the defendant thus to qualify the exclusive jurisdiction given to the State of New York.

This construction will lead to no absurdities or difficulties. The jurisdiction of each State is clearly defined and limited except as to the right on the part of New Jersey to serve process, to regulate the fisheries, and to own the land under water, and except her jurisdiction over the wharves, docks and improvements upon her shore, the jurisdiction of New York is exclusive.    New Jersey has no right to make the wharves, docks and improvements without the consent of New York; but when they have been made by her consent, then the exclusive jurisdiction of New Jersey attaches.    She cannot add to her jurisdiction and take away from the jurisdiction of New York by structures wrongfully made.    If the low water mark, as it existed in 1833, is thrown forward by gradual accretion, the land thus reclaimed from the water will fall under the jurisdiction of New Jersey and the jurisdiction of New York will recede with the low water mark. (Kent's Com., 428; *Attorney-General* v. *Chambers*, 5 Jurist. N. S., 745; *Deerfield* v. *Arms.*, 17 Pick., 41; *Adams* v. *Frothingham*, 3 Mass., 352.)    I conclude, therefore, that the structures and operations complained of in the complaint were within the State of New York and hence within the judicial jurisdiction of the court in which the action was commenced and tried.    Having reached this conclusion, it is unnecessary to cite authorities to show that, upon the facts proved, the equitable jurisdiction of the Supreme Court was properly invoked and the judgment pronounced was fully authorized.    The judgment should, therefore, be affirmed with costs.

GROVER, J., held with EARL, Ch. J., that this State has a general jurisdiction, but thought the treaty of 1833 gave to New Jersey jurisdiction of wharves, &c., made and to be

made, and power to decide where and how they shall be made, and was therefore for reversal.

All concur for reversal except EARL, Ch. J., who was for affirmance, and SUTHERLAND, J., who, having been of the court below, did not vote.

Judgment reversed and complaint dismissed with costs.