ROY CLARKE, Plaintiff, v. RICHARD A. ACKERMAN, Defendant.[*]

Supreme Court, New York County, December 21, 1934.

*James E. Mulcahy*, for the plaintiff.

*Plaut & Davis*, for the defendant.

COLLINS, J. This motion to vacate the service of a summons, made pursuant to section 52 of the Vehicle and Traffic Law, presents the arresting and hitherto undetermined question whether the State of New York has acquired jurisdiction over an action arising out of an accident which concededly occurred on the west side of the center line of George Washington Bridge, which bridge connects the States of New York and New Jersey.

It appears from the affidavit of a bridgeman employed on the bridge by the Port of New York Authority that defendant's auto-

---

[*] Revd., 243 App. Div. 446.

mobile, bearing a West Virginia license, collided with the plaintiff's motorcycle at or near lamp post No. 116, which is located approximately 811 feet west of the center of the span, and an equal number of feet west of a sign which marks the dividing line between the two States.

Section 52 permits service of process on a non-resident motor vehicle operator in an action growing out of any " accident or collision in which such nonresident may be involved while operating a motor vehicle on a public highway" in this State, by serving the process on the Secretary of State.

Service was so made here. The defendant, appearing specially, challenges the validity of the service because, so he maintains the accident did not occur " on a public highway *in* this State."

He assigns two arguments in support of his position: *First,* that the bridge is not owned and operated by either State but by the separate body politic known as " The Port Authority," and *second,* that the locale of the accident was not *in* the State of New York.

The first contention is not impressive. The logical terminus of its pursuit would be that even if the accident occurred to the *east* of the center of the bridge, New York could not exercise jurisdiction. Indeed, this argument would exclude both States from jurisdiction.

The second objection is not so free from entanglement.

True, the sign at the center of the bridge indicates that the center is the dividing line. That factor is illuminating but not decisive.

The Port of New York Authority was created on April 30, 1921, by a compact between the two States. The compact received the approval of the Legislatures of both States and the assent of Congress.

The preamble of the compact declares that " The territorial or boundary lines established by the agreement of eighteen hundred and thirty-four, or the jurisdiction of the two states established thereby, shall not be changed except as herein specifically modified."

Examining the compact of 1834 (Laws of 1834, chap. 8), as continued in force by the Consolidated Laws (State Law, § 7), we find in article first: " The boundary line between the two states of New York and New Jersey, from a point in the middle of Hudson river opposite the point on the west shore thereof, in the forty-first degree of north latitude, as heretofore ascertained and marked, to the main sea, shall be the middle of the said river, * * * except as hereinafter otherwise particularly mentioned."

Technically and literally, therefore, the accident occurred on the New Jersey portion of the bridge; the scene was over land and water *owned* by that State.

But article third of the agreement declares that "The State of New York shall have and enjoy exclusive jurisdiction of and over all the waters of the bay of New York, and of and over all the waters of the Hudson River lying west of Manhattan Island and to the south of the mouth of Spuytenduyvel creek, and of and over the lands covered by the said waters to the low water mark on the westerly or New Jersey side thereof."

And article seventh provides that "civil process issued under the authority of the state of New York, against any person domiciled in that state, or against property taken out of that state to evade the laws thereof; may be served upon any of the said waters within the exclusive jurisdiction of the state of New Jersey."

An intensely interesting and light-shedding historical discussion of the subject reposes in *People* v. *Central R. R. of N. J.* (42 N. Y. 283; writ dismissed, 12 Wall. 455; 20 L. Ed. 458).

Speaking of the report of the commissioners, the court (at p. 295) said: "It is quite apparent, I think, that they well and wisely considered that the necessities of the case, the welfare of these States, the exigencies of commerce, and the interests of the city and port of New York in particular, in whose prosperity, as the commercial metropolis of the country, New Jersey had, in a large decree, a common interest, required that there should be a unity of control over said waters, and a single and exclusive jurisdiction exercised over them by one of the said States. And this control or jurisdiction, in the language used in that treaty or agreement, was very properly conceded to this State in the following article:

"Article 3. 'The State of New York shall have and enjoy exclusive jurisdiction of and over all the waters of the Bay of New York, and of and over all the waters of Hudson river lying west of Manhattan Island and to the south of the mouth of Spuyten Duyvil creek, and of and over the lands covered by the said waters to low water mark on the westerly or New Jersey side thereof, subject to the following rights of property and of jurisdiction of the State of New Jersey.' This provision in the treaty most clearly and distinctly gives and grants to, and vest in the State of New York, full, complete and undoubted control, government and jurisdiction of and over all the waters therein mentioned. Such was the clear intent and purpose of this provision; and, so so far as it was essential to the proper exercise of such jurisdiction, it gives a control also of and over the land covered by such waters. It doubtless was designed in the clause of said provision in these words: 'Of and over the lands covered by the said waters to low water mark,' to disembarrass the jurisdiction so conferred over the said water, from all pretense of right to interfere therewith arising

from the legal maxim, that the owner of the soil owned all above it, ' *cujus est solum, ejus est usque ad coelum.*' So that the jurisdiction over the water should be absolute and unquestioned for all practical purposes."

Again (at p. 299): " This exception explains the object and nature of the jurisdiction intended to be given to New York. It was to be a police jurisdiction of and over all vessels, ships, boats or craft of every kind that did or might float upon the surface of said waters, and over all the elements and agents or instruments of commerce, while the same were afloat in or upon the waters of said bay and river for quarantine and health * * * and regulations for the protection of passengers and property, and all fit governmental control designed to secure the interests of trade and commerce in said port of New York, and preserve thereupon the public peace."

Since the compact of 1834, reaffirmed in the compact of 1921, grants to the State of New York exclusive jurisdiction over the Hudson river, and since this bridge spans the river, it would follow that New York has exclusive jurisdiction over and on the bridge. If the Hudson river is New York territory for jurisdictional purposes, then the bridge above it is New York territory for those purposes.

The answer to the query which this motion poses resides in the reasonable and practical construction and application of both article third and article seventh read together and in the light of section 52 of the Vehicle and Traffic Law.

In the peculiar circumstances here revealed, the boundary line alone should not be controlling. Considering the intent of section 52 of the Vehicle and Traffic Law in conjunction with the agreement of 1834, a more reasonable interpretation would be that " on a public highway in this state " has the same signification as a public highway within the exclusive jurisdiction of the State.

Such a finality would make for more certainty and achieve greater uniformity. The sole element of geography should surrender to the weightier force of practicality. The spirit of the law is more compelling than the letter. I so hold. Accordingly, the service on the Secretary of State was valid. The motion to vacate is denied. Defendant's time to answer or move with respect to the complaint is extended to and including December 28, 1934.