THE BOARD OF HEALTH OF THE STATE OF NEW JERSEY

v.

THE INHABITANTS OF THE TOWN OF PHILLIPSBURG.

[Decided August 28th, 1914.]

1. By an act of the legislature (P. L. 1899 p. 536) entitled "An act to prevent the pollution of the waters of this state by the establishment of a state sewerage commission, and authorizing the creation of sewerage districts and district sewerage boards, and prescribing, defining and regulating the powers and duties of such commission and such boards," the state sewerage commission was constituted; and, by a supplement thereto (P. L. 1908 p. 605) reciting the title of the original act, all the

powers and duties theretofore vested in and executed by the state sewerage commission were vested in, and were to be executed by the board of health of the State of New Jersey. Upon a bill filed by the board of health of the State of New Jersey to enjoin the town of Phillipsburg from polluting the waters of the Delaware river by permitting sewage and other polluting matter to flow therein from its sewers and drains—*Held*, that such legislative transfer of jurisdiction from the state sewerage commission to the state board of health is efficacious, although not expressed in the title of the supplement.

2. While the constitution, article 4, section 7, *placitum* 4, provides that "every law shall embrace but one object, and that shall be expressed in the title," the meaning is that the leading subject of a statute should be fairly expressed in a statute; but the means or instruments by which the general purpose is to be attained, or matters merely incidental to it, are not a necessary part of the title, the words "subject" and "object" with regard to this constitutional provision having come to be regarded as synonymous.

3. If it is only necessary to express the general object of a statute in its title, and in expressing it, it is not necessary to express the means or method of attaining that object, or name the instrumentality for carrying it out, then, even if such minor or incidental matters are included in the title of a given statute, they cannot operate to deprive the legislature of its power to amend a given act in reference to those minor and incidental matters, through amendments of, and supplements to, the original act, appropriately reciting the title of that act.

4. The supplement of 1907 (*P. L. 1907 p. 360*), providing that "'waters of this state,' as used in this act and the act to which this is a supplement, shall include the ocean and its estuaries, all springs, streams and bodies of surface or ground water, whether natural or artificial, within the boundaries of this state or subject to its jurisdiction," extends to, and comprehends, the Delaware river at the town of Phillipsburg.

5. While the title to the bed of the Delaware river above tidewater is in the private riparian owners, subject to the paramount public right of user, that use can as well be directed towards purification of the stream as towards control for the purpose of navigation.

6. As power to conserve the potable waters of the river Delaware by legislation, enforceable on, in and under the waters flowing within the boundary, and subject to the jurisdiction, of the State of New Jersey, was not included in the enumeration of rights to be exercised conjointly by the States of New Jersey and Pennsylvania in the compact of 1783 (*Comp. Stat. p. 5368*), that power was retained by this state by as clear an implication as though it was, by express language, so reserved in the pact.

7. It is no ground for denying an injunction to stop the town of Phillipsburg from discharging its sewage into the Delaware river, that the sewage of the city of Easton in the State of Pennsylvania, and the polluting flow of the Lehigh river in the State of Pennsylvania, are discharged into the same stream in the same locality.

8. The authority given originally to the state sewerage commission, but now vested in the state board of health, authorizes the board, if it finds that any of the waters of this state are being polluted in such manner as to *cause* or *threaten* injury to any of the inhabitants of this state either in health, comfort or property, to apply to this court for an injunction to prevent violation, or to enforce the provisions of, the act; and, therefore, the injury need not be actual, but only threatened.

On bill, &c.   On final hearing on pleadings and proofs.

*Mr. Nelson B. Gaskill,* assistant attorney-general, for the complainant.

*Mr. John I. Blair Reiley* and *Mr. Gilbert Collins,* for the defendant.

WALKER, CHANCELLOR.

The complainant in this cause is a *quasi*-corporation created and existing under and by virtue of an act of the legislature approved March 31st, 1887 *(P. L. 1887 p. 80)*, and the various acts amendatory thereof and supplementary thereto.

The state sewerage commission was constituted under and by an act of the legislature approved March 24th, 1899. *P. L. 1899 p. 586.* The title of this act is important in this litigation. It reads as follows:

"An act to prevent the pollution of the waters of this state by the establishment of a state sewerage commission, and authorizing the creation of sewerage districts and district sewerage boards, and prescribing, defining and regulating the powers and duties of such commission and such boards."

This act was subsequently amended *in extenso* by an act approved March 21st, 1900. *P. L. 1900 p. 113.*

To this act a supplement was passed, approved May 7th, 1907. *P. L. 1907 p. 361.*

In and by section 1 of the last-mentioned act it was provided as follows:

"The state sewerage commission is hereby authorized and empowered to inspect any of the waters of this state, and if it finds that any of the waters of this state are being polluted in such manner as to cause

or threaten injury to any of the inhabitants of this state, either in health, comfort or property, it shall be its duty to notify, in writing, any person, municipal or private corporation found to be polluting said waters that prior to a time to be fixed by said commission, which time shall not be more than five years from the date of said notice, said person or corporation must cease to pollute said waters and make such other disposition of the sewage or other polluting matter as shall be approved by said commission; any person or corporation aggrieved by any such finding may appeal therefrom to the court of chancery at any time within three months after being notified thereof, and the said court is hereby authorized and empowered to hear and determine such appeal in a summary manner, according to its course and practice in other cases, and thereupon to affirm, reverse or modify the finding of said commission in such manner as it may deem just and reasonable."

And by section 2 as follows:

"The state sewerage commission is hereby authorized to apply to the court of chancery for writ of injunction to prevent any violation of or enforce the provisions of this act and the act to which this is a supplement, and it shall be the duty of the said court, in a summary way, to hear and determine the merits of said application; and in all such cases to restrain violation of or enforce the provisions of the said acts."

And by section 3 as follows:

" 'Waters of this state,' as used in this act and the act to which this is a supplement, shall include the ocean and its estuaries, all springs, streams and bodies of surface or ground water, whether natural or artificial, within the boundaries of this state or subject to its jurisdiction."

By section 8 of the amendatory act of 1900 (*P. L. 1900 p. 113*) it is provided as follows:

"It shall be unlawful for any person, corporation or municipality, after the date specified in the notice provided for by the fifth section of this act, to permit or allow any sewage, or other polluting matter, to flow into said waters from any sewer, drain or sewerage system, under the control of said person, corporation or municipality, except under such conditions as shall be approved by the state sewerage commission."

Subsequently, and by virtue of an act of the legislature approved April 16th, 1908 (*P. L. 1908 p. 605*), the terms of office of the several members of the state sewerage commission were terminated; and by another act approved on the same day (*Ibid.*) entitled

"A supplement to an act entitled 'An act to prevent the pollution of the waters of this state by the establishment of a state sewerage commission, and authorizing the creation of sewerage districts and district sewerage boards, and prescribing, defining and regulating the powers and duties of such commission and such boards,' approved March twenty-fourth, one thousand eight hundred and ninety-nine,"

all the powers and duties theretofore vested in and executed by the state sewerage commission were vested in, and were to be executed by, the board of health of the State of New Jersey, and it was therein further provided that nothing contained in that act should be held to abate or render invalid any notice or proceeding, or suit at law or in equity, which had been served, begun or instituted by the state sewerage commission, prior to the date of the said act, but that the same should continue in full force and effect, and be further advanced and prosecuted in the name of the board of health of the State of New Jersey.

The town of Phillipsburg is located upon the east bank of the Delaware river, within the State of New Jersey, which river is numbered among the waters of this state used for potable purposes by its citizens, and is subject to the jurisdiction of this state, as will presently be shown.

The town of Phillipsburg was incorporated by an act of the legislature approved March 8th, 1861, by the name of "the inhabitants of the town of Phillipsburg."

The state sewerage commission, prior to its abolition, investigated a complaint of pollution of the waters of the Delaware river by the flow of sewage and other polluting matter from the town of Phillipsburg, and found that the river was one of the waters of this state used for potable purposes by its citizens, and that those waters were being polluted by the town of Phillipsburg in such manner as to cause, and threaten to cause, injury to the inhabitants of this state in their health, comfort and property by permitting sewage and other polluting matter to flow into the waters of the Delaware river from the sewerage systems and drains of the town, and therefore, on the 8th day of October, 1906, the said state sewerage commission gave notice, in writing, to the town of Phillipsburg (which was duly served on the 13th day of October, 1906, on Joseph H. Firth, mayor of the town of Phillipsburg), directing and commanding that town to cease

polluting the waters of the Delaware river by permitting sewage and other polluting matter to flow therein from the sewers and drains of the town, prior to the 1st day of October, 1907, being not more than five years from the date of the notice, and that before the date mentioned the town of Phillipsburg should make such disposal of its sewage and other polluting matter as should be approved by the state sewerage commission.

The town of Phillipsburg has not appealed to the court of chancery from the notice to cease from polluting the river from and after October 1st, 1906, nor had it, at the time of filing the bill in this cause, ceased to pollute the Delaware, one of the potable waters of this state, nor prior to October 1st, 1907, made such disposal of its sewage and other polluting matter as should be approved by the state sewerage commission. And this situation continues.

The city of Trenton, and various other cities of this state, are now using the waters of the Delaware river for potable purposes, supplying the same to their citizens, inhabitants of New Jersey, who, by reason of the pollution of the waters of that river, as hereinabove set out, are suffering injury in their health, comfort and property, in that they are compelled to expend large sums of money to purify the waters of the Delaware for potable purposes, for the protection of their health, and to exercise unusual precaution to protect themselves from risk of disease arising from pollution of those waters.

The bill prays that the town of Phillipsburg, by mandatory injunction, may be compelled to cease from polluting the waters of the Delaware river by permitting sewage and other polluting matter to flow therein from its sewerage system and drains, and to make such disposal of its sewage and other polluting matter as shall be approved by the board of health of the State of New Jersey, and for other and further relief.

The first defence leveled at the complainant's proceedings is that the state board of health, while endeavoring, has not the power to enforce the notice of the state sewerage commission of October 8th, 1906, requiring the town of Phillipsburg to cease polluting the waters of the Delaware by permitting sewage and other polluting matter to flow therein from its sewers and drains,

prior to the 1st day of October, 1907. The contention is that the attempt to transfer jurisdiction from the state sewerage commission to the state board of health was nugatory because not within the title of the supplement of April 16th, 1908. *P. L. 1908 p. 605.*

With this contention I disagree. I concede that the complainant's right to maintain this suit must rest upon the validity of the act last mentioned, for, surely, if the state board of health was not authorized to abate the nuisance of the pollution of the Delaware river on September 24th, 1908, its bill filed on that day would not lie. The question, therefore, resolves itself into this: Could the legislature, by the supplement of April 16th, 1908 (*P. L. 1908 p. 605*), transfer from the state sewerage commission to the state board of health the right to enforce the provisions of the original act to which it was a supplement, and which original act clothed the state sewerage commission with the power sought to be enforced in this suit by the state board of health? I think it could, and for this reason:

While the constitution, article 4, section 7, *placitum* 4, provides that "every law shall embrace but one object, and that shall be expressed in the title," it was held, in *Onderdonk* v. *Plainfield, 42 N. J. Law 480,* that "the leading subject of a statute should be fairly expressed in the title, but the means or instruments by which the general purpose is to be attained, or matters merely incidental to it, are not a necessary part of the title."

Although the word "subject" is substituted for "object" in the syllabus, "object" is the word intended, as appears from an examination of the opinion, and "object" is the language of the constitutional provision; but this is quite immaterial as "subject" and "object," with reference to this constitutional provision, have come to be regarded as synonymous. *Sawter* v. *Schoenthal, 83 N. J. Law 499, 500, 501.*

The act under consideration in *Onderdonk* v. *Plainfield* was entitled "An act to lay out and open streets in the township of North Plainfield, in the county of Somerset, and in the city of Plainfield, in the county of Union." The act provided for its being carried into effect through the instrumentality of certain

commissioners. This was in the body of the act, no mention of the commissioners—the instrumentality for carrying out the act—being made in the title. The supreme court said (at *p. 483*) :

"It was, therefore, manifest to all that the object sought could only be gained through the creation of new instrumentalities, and the expression of a purpose of enabling streets to be laid out, necessarily implied the adoption of new machinery. These were merely incidental to the general object of the act."

In *Bumsted* v. *Govern,* *47 N. J. Law 368,* Mr. Justice Dixon, speaking for the supreme court, said (at *p. 373*) :

"The constitutional provision is that 'every law shall embrace but one object,' and that shall be expressed in the title.

"It is not necessary to review the numerous decisions involving the application of this and similar clauses. It is, on all hands, agreed that its purpose is to require the title of a bill to be such as will inform the public and the members of the legislature of the object of the enactment, and that this purpose is accomplished when the title fairly indicates the general object, although it does not indicate the means or methods of attaining this object."

And again (on *p. 374*) :

"The question then is, whether this title was fairly adapted to apprise the public and the members of the legislature of the general object of the law. I think it clearly was. * * * That was the general object of the act, and that alone was necessary to be expressed in the title. For the particular method of reaching the end every one was legally bound to examine the body of the statute."

To the same effect are *State* v. *Town of Union, 33 N. J Law 350; Johnson* v. *Asbury Park, 58 N. J. Law 604; Drew* v. *West Orange, 64 N. J. Law 481.*

Now, if it is only necessary to express the general object of a statute in its title, and that in expressing it it is not necessary to indicate the means or method of attaining that object, or name the instrumentality for carrying it out, then, surely, even if such minor or incidental matters are included in the title of a given statute, they cannot operate to deprive the legislature of

its power to amend the given act, in reference to those minor and incidental matters, through amendments of, and supplements to, the original act, appropriately reciting that act's title.

Let me illustrate: If the act under consideration had been entitled "An act to prevent the pollution of the waters of this state," and stopped there, it would have been just as efficacious for the attainment of the legislative purpose as the title which was adopted, containing these superadded words:

"By the establishment of a state sewerage commission, and authorizing the creation of sewerage districts and district sewerage boards, and prescribing, defining and regulating the powers and duties of such commission and such boards."

If the short title just suggested had been employed, and in the body of the act alone had provision been made for the instrumentality for carrying out the act, namely, the creation of the state sewerage commission, then, surely, that instrumentality could have been changed by the abolition of that commission and the devolution of its powers upon the state board of health by an act which could have been entitled "A supplement to an act entitled 'An act to prevent the pollution of the waters of this state.'"

It is no answer to say that because the legislature chose to embrace in the title of the original act a description of the instrumentality through which its general purpose was to be carried out, that, therefore, in any amendment, having for its object a change of that instrumentality, it would be necessary to express the particular change in the title of the amending act, because the instrumentality originally created was described in the original title; for this reason, and it is all sufficient, that no such trammel rests upon the legislature, unless it is to be found in a mandate of the constitution, and there is none such.

Anciently, statutes had no titles and the practice of prefixing them to acts of the English parliament probably commenced in the reign of Henry III. (*State* v. *Town of Union, supra*); and, doubtless, they might be omitted from legislative bills in this state but for the constitutional provision that the object of every act shall be expressed in its title.

A case quite in point is that of *Drew* v. *West Orange, supra.* There the act, whose constitutionality was attacked, was entitled "An act authorizing the inhabitants of townships to purchase or erect a building for township purposes." And Mr. Justice Dixon, speaking for the supreme court, said (*64 N. J. Law,* at · p. *482*) :

"The second objection is that the title of the act does not constitutionally express the object of the law, since the title states that the inhabitants are to be authorized to purchase, &c., while in the body of the act they are only empowered to authorize the township committee to purchase, &c. We think the object of the law is correctly expressed in the title, the feature of the act above adverted to merely pointing out the agency through which the authority delegated to the inhabitants shall be exercised."

In that case it will be observed the general object expressed in the title was to authorize the inhabitants of townships to acquire buildings for township purposes. In the title the inhabitants of the townships were the agency or instrumentality described as having power to make the acquisition. In the body of the act quite another agency or instrumentality was set up, namely, township committees, after authorization by the inhabitants of the townships. This title was held good because the supreme court did not regard the description of the agency to carry out the object of the act as necessary to be stated in the title, and, it seems to me, held in effect that the agency might be incorrectly described in the title, because, in that case, the fair intendment of the language used in the title was to point out the inhabitants of townships (in their collective capacity in town meetings, doubtless) as the agency authorized to purchase or erect township buildings, when, in fact, in the body of the act, those agencies were only authorized to effectuate the object of the law by delegating authority to another instrumentality.

To sum it up: On this head of the argument I deduce the rule to be that when in an act of the legislature, which can constitutionally have but one object and that object must be expressed in the title, superadded words are inserted in the title, describing instrumentalities and other minor or incidental matters, such words cannot operate to foreclose the legislature from

afterwards amending the body of the act in such a way as to affect those instrumentalities, minor and incidental matters, under and by a title which expressly amends the original act, appropriately reciting its title. In other words, because an act in its title expresses objects, minor and incidental to its general object, it cannot thereby raise those minor and incidental matters to the dignity and importance of the main object, so as to restrain and limit the legislature from dealing with that act by way of amendment or supplement relating to those minor and incidental matters unless they too be mentioned in the title of the later act, and thus create a constitutional restriction which does not, in fact, exist.

In this case, I think, I may pertiently paraphrase the remarks of Mr. Justice Swayze, speaking for the court of errors and appeals, in *Sawter* v. *Schoenthal, supra* (at *p. 503*), and say:

Everyone must, according to our legal maxim, be presumed to know that an act of the legislature constitutionally can have but one object, and that that object must be expressed in its title, but that if minor and incidental matters are expressed in the title, they cannot be held to restrict the law-making body in legislating with reference to those minor or incidental matters in subsequent acts amending or supplementing the original act by reference to its original title only without expressing in the title of the amending or supplementing act the change proposed to be made with reference to those minor and incidental matters. With this knowledge no one could help inferring that the object of the supplement of April 16th, 1908 (*P. L. 1908 p. 605*), was to probably change some minor or incidental provision of the original act, and, possibly, the instrumentality through which it was to be enforced, although that object was not expressed in the title of the supplement.

Mr. Justice Swayze goes on to remark that in the known state of the law with which he was dealing the title of the act then under consideration gave notice, not only of its immediate object clearly expressed, but of its ultimate object clearly implied. I cannot paraphrase this observation in the case at bar for want of analogous facts, nor is it necessary. A supplement in a certain sense gives no intimation of its object. It is expressed to be a

supplement to the original act, reciting the title of that act. The only notice contained in the title of a supplement is, that something germane to the original act is therein enacted. Now, as we have seen in *Drew* v. *West Orange,* the title of an original act may incorrectly describe a minor or incidental matter contained in the body of the act, namely, the instrumentality through which the act itself is to be effectuated and carried out. By analogy, the original act "to prevent the pollution of the waters of this state by the establishment of a state sewerage commission," &c., might as lawfully have provided for the carrying out of the object of the act, namely, the prevention of pollution, by making the state board of health the instrumentality for carrying it out, instead of the state sewerage commission, although the state sewerage commission and not the state board of health was mentioned in the title, at least so far as any constitutional requirement is concerned. The general object of the act (to prevent pollution of the waters of the state) being expressed in the title—the language in the title pointing out the agency through which the delegated authority should be exercised, expressing something merely incidental, was unnecessary, and, although expressed in the title, its presence there could not control or restrict the enacting clauses. Again, the general object of the act being expressed in the title, namely, to prevent the pollution of the waters of this state, all persons interested in that subject would be obliged to look at the enacting clauses to see what provisions were made for carrying the act into effect (quite aside from the instrumentality created), and it could make no difference to them if they found that the legislature had, in the body of the act, departed from its gratuitously expressed intention with reference to the instrumentality for effectuating its objects as expressed in the title—that being minor and incidental to the general and paramount object, which was, I repeat, the prevention of the pollution of the waters of this state, no matter how—and they would be charged with knowledge, too, even if they did not look into the act, that the legislature might make such departure from expressed intention between title and enacting clauses, in a minor matter—one not referable to the *general object,* or at least not *necessarily* involved in it.

Holding, as I do, that the supplement of April 16th, 1908, is valid and efficacious to transfer from the state sewerage commission to the state board of health the right to enforce the provisions of the original act to prevent the pollution of the waters of this state, it is unnecessary to decide whether the act approved April 17th, 1909 (P. L. 1909 p. 215), to change and amend the title and body of the supplement of April 16th, 1908, which act of 1909 also vests in the state board of health the powers and duties theretofore vested in the state sewerage commission, constitutionally effected the change contended for by the complainant. For the same reason it is unnecessary to decide whether the same result was accomplished by the act of April 1st, 1912 (P. L. 1912 p. 547), to also amend the title of the original act so that the same shall indicate the object of the act to vest in the state board of health all the powers and duties theretofore exercised by the state sewerage commission. It would seem that these last-mentioned acts of 1909 and 1912 were passed because of some doubt as to the validity of the title of the supplement of 1908 so far forth as changing the instrumentality to enforce the principal object of the original act was concerned. Whether so or not, I think the doubts, if they existed, were illusory; but, if not, the transfer of power by one or the other, or both, of these acts (1909 and 1912) may be saved upon the doctrine enunciated by the court of errors and appeals in *Sawter* v. *Schoenthal, supra,* but that question, also, it is unnecessary to decide.

The defendant contends that, quite irrespective of the question just considered, the complainant is impotent to enforce the statute against it because the legislation in question does not extend to and comprehend the Delaware river. The act, as has been observed, is "one to prevent the pollution of the waters of this state." These words are in the title and body of the act.

In the supplement of 1907 (P. L. 1907 p. 360), giving authority to bring an injunction suit, it is provided in section 3:

" 'Waters of this state,' as used in this act and the act to which this is a supplement, shall include the ocean and its estuaries, all springs, streams and bodies of surface or ground water, whether natural or artificial, within the boundaries of this state or subject to its jurisdiction."

Chancellor Runyon held in *Attorney-General* v. *Delaware and Bound Brook Railroad Co., 27 N. J. Eq. 1:*

"The Delaware river became, by conquest, the boundary between the States of New Jersey and Pennsylvania; and being such, and the original property being in neither of them, and there being no convention between them in regard to it, when, in 1783, the King of Great Britain relinquished all claims to government, propriety and territorial rights in the United States, each state, by the rule of international law, had dominion to the middle of the stream."

And also:

"New Jersey has no *jus privatum* in the soil of the Delaware river above tidewater—that is, in the riparian owners, subject to the public easement of navigation, and to such regulations by the legislature of the waters as the public right of navigation may require. As to the jurisdiction and power of the state over it, the river above tidewater is to be regarded as a navigable stream."

This is a direct decision, to the effect that New Jersey controls the Delaware river to the middle of that stream. This case was affirmed by the court of errors and appeals (*Ibid. 631*), the third syllabus laying it down that:

"The bed of the Delaware river above tidewater, from the easterly bank *ad filum medium aquæ*, passed by the grant from Charles II., to the Duke of York, dated March 12th, 1664, and is private property."

And in the opinion, Mr. Justice Dixon, speaking for that court, said (at *p. 641*) :

"Of this class, then, is the Delaware river above the tide; the title to the bed is in the private owner, but is subject to the paramount public right to use the river as a common highway, in which is included the right to so control and change the bed as to preserve and improve the navigability of the water."

If, then, while the title to the bed of the Delaware river above tidewater is in the private riparian owners, subject to the paramount public right of user, that use can as well be directed toward purification of the stream as to control for the purpose of navigation.

*Wilson, Attorney-General,* v. *Hudson County Water Co., 76 N. J. Eq. 543,* was a case dealing with the state's ownership of land lying under tidewater, but holds, upon authority, that this ownership extends to arms of the sea within its boundaries and to the centre of waters which are the boundary line between this state and New York. *Ibid. 547.* It, of course, follows, that where this state does not own, but controls, waters within its boundaries, as in the case of non-tidal waters, that control extends *ad filum medium aquæ* to all waters dividing this from any other state. And such is the situation at Phillipsburg within this state, situate as it is on the east bank of the Delaware river above tidewater. This holding is not inconsistent with any of the provisions of the compact of 1783 between the States of New Jersey and Pennsylvania settling jurisdiction over the Delaware river. *Comp. Stat. p. 5368.* It was expressly decided by this court in *Attorney-General* v. *Delaware and Bound Brook Railroad Co., supra,* that the objects and purposes of the compact were merely to secure the administration of justice and the use of the river as a public highway; the provisions for concurrent jurisdiction having reference to the former only and were a mere police regulation. This holding was in nowise modified in the court of errors and appeals. See *S. C., 631.*

The language of Chancellor Runyon on this particular question, in the *Delaware and Bound Brook Railroad Case,* is so illuminative and dispositive of it, that I feel justified in quoting from his remarks at some length. He said (*27 N. J. Eq.,* at *p. 12 et seq.*) :

"In 1817, differences arose between the states in regard to wingdams and obstructions placed in the river on the New Jersey side by riparian owners, of which Pennsylvania complained on the ground that they were injurious to the navigation. The report of a committee of the general assembly of this state to that body on the subject, is evidence of the construction which had been put upon the compact of 1783. It was presented by the chairman, Isaac H. Williamson, and it distinctly asserts the right of each state to authorize, without the concurrence of the other, the erection of mills and wingdams on its own shores, and

within its own jurisdiction, not injurious to navigation. *Min. Assem. 1817.* And still further, the commissioners appointed by this state to settle, in conjunction with those appointed by Pennsylvania, the differences above mentioned, were William S. Pennington, David Thompson and Elliot Tucker. In their first written communication, dated September 15th, 1817, to the commissioners of Pennsylvania, they say:

" 'It appears to us that the respective legislatures of Pennsylvania and New Jersey, notwithstanding the agreement of 1783, have a right to give their assent to, and to regulate by law, the erection, on their respective shores, of all useful piers, docks, wharves, banks, and even milldams, or other buildings for the beneficial use of the respective shores; but that in the exercise of this authority they are bound, as well by public law as by the agreement of 1783, to preserve the navigation of the river. We consider the agreement of 1783 nothing more than a declaration that the river Delaware, within the limits prescribed, then was, and should continue to be, a public navigable river, in contradistinction to a private river, and that it must be subject to the same law as all other public navigable rivers that are deemed public highways. We apprehend it to be a mistaken opinion, however extensively it may have spread itself, that the whole bed of the river is sacred, and cannot be touched without a violation of the rights of the state we represent. The soil of the river to the midway thereof, at least at and above the falls of Trenton, if not below, is vested by law in the owners of the adjoining land. It is true the same principle of law that vests this private right in the owners of the adjacent soil, also vests in the public the rights of unobstructed navigation. We admit that this private right must be so exercised as not to injure the public right of navigation. It is not every erection on the bed of the river that becomes a nuisance, and is to be construed as a violation of the agreement of 1783; if this was the case, all the piers and docks erected in the river must be destroyed. Docks and wharves judiciously placed on the river are useful to commerce; in which case they are innocent and lawful erections. But, should they become so far extended as to obstruct navigation, they would become public nuisances, be unlawful, and liable to prostration. We apply the same reasoning to milldams, and other erections on the river. Their lawfulness or unlawfulness depends on the fact whether they are or are not obstructions to navigation. We have been more particular in disclosing our opinions on this head, that we might, at one view, enable you to understand the reasoning that led to certain legislative acts of New Jersey relative to wingdams.'

"The commissioners close a subsequent communication to the commissioners of Pennsylvania, dated September 17th, 1817, as follows:

27

" 'Whether the English doctrine, conferring the bed of the river to the middle thereof, on the owners of the adjacent soil, is adopted in this country or not, is a question wholly immaterial in the present inquiry. Whether it is in the owners of the adjoining land, the representatives of the original proprietors, or the state, is a question to be settled in each state by the laws thereof, and has no bearing on the subject under investigation. It is sufficient that it is in one or another of them. We contend that the agreement of 1783 did not touch the soil, but was confined to questions of jurisdiction and navigation, and that the bed of the Delaware river to the midway thereof, from the first settlement of the country to this hour, has belonged to the State of New Jersey, or some of the citizens thereof, and that the Commonwealth of Pennsylvania never had, and, as we believe, never pretended to have any title thereto.'

"It appears from these public documents, which respectively have the sanction of two eminent names of the past generation, the first, Governor Pennington and Governor Williamson, that thirty-five years after the making of the compact, the theory of joint ownership of the river was not entertained by this state, and was not regarded as an implication from the compact. It has never been recognized since then. The act of March 1st, 1820, to 'prevent obstructions to the navigation of the river Delaware' (*Rev. L. p. 708*), cited in support of it, does not recognize it. The objects and purposes of the compact were merely to secure the administration of justice and to secure to the contracting parties the use of the river as a public highway. The provision for concurrent jurisdiction had reference to the former only. It was a police regulation merely, and gave to neither of the states any dominion or authority whatever over, or right in, or control of, that part of the soil of the river which, by the law of nations, belonged to the other. The construction put by the court of appeals of New York, in *People* v. *Central Railroad Co. of New Jersey, 42 N. Y. 283*, upon the compact made in 1833 between this state and the State of New York (*Nix. Dig. p. 965*), is in point. By the third article of that compact it was declared that New York should have and enjoy exclusive jurisdiction of and over all the waters of Hudson river lying west of Manhattan Island, and to the south of the mouth of Spuytenduyvel creek, and of and over the lands covered by the said waters, to the low-water mark on the westerly or New Jersey side thereof, subject to certain designated rights of property and jurisdiction of New

Jersey, among which was the exclusive right of property in the land under water lying west of the middle of the bay of New York, and west of the middle of that part of Hudson river which lies between Manhattan Island and New Jersey, and exclusive jurisdiction of and over the wharves, docks and improvements made, or to be made, on the shores of this state, and of and over all vessels aground on the shore, or fastened to any such wharf or dock, except that such vessels were to be subject to the quarantine or health laws of New York. The suit was brought by the attorney-general, in behalf of the state, to abate as nuisances, and cause the removal of certain wharves, bulkheads, piers and railroad tracks, and other erections which the defendants had placed in the harbor of New York, and extending into the harbor and the Hudson river about a mile from the New Jersey shore. The complaint claimed that the erections were within the limits and jurisdiction of New York, and were an obstruction to navigation, and injurious to the public health, and were constructed without lawful authority. They were all placed on the west of the designated boundary line. It was held that the jurisdiction conferred upon New York over the waters of the river and bay was a qualified and limited jurisdiction, for police and sanitary purposes, and to promote the interests of commerce in the use and navigation of those waters, and was not designed to confer or create control over the lands or domains of New Jersey or to give to New York any right to interfere with the complete political or governmental jurisdiction of this state, as a sovereign state, of and over her own soil, and its appurtenances and of and over every description of property of any appreciable value, within her territorial limits.

"The appositeness of the conclusion expressed in that case to the case now under consideration will be all the more noticeable when it is observed that by the compact just referred to, *exclusive* jurisdiction was given to New York, not only over the waters, *but over the lands covered by the waters,* while, by the compact with Pennsylvania, concurrent jurisdiction is given to the contracting parties, and such jurisdiction is *expressly confined to the waters.*

"The compact of March 28th, 1785, between Maryland and

Virginia, among other things, provides that the Potomac river shall be considered as a common highway for the purposes of navigation and commerce to the citizens of those states, and of the United States, and to all other persons in amity with Maryland and Virginia, trading to or from either of those states; and it establishes concurrent legislation; also for the preservation of fish, and for the performance of quarantine, and keeping open the channel and navigation by preventing the throwing out of ballast, or making any other obstruction. *Laws of Md. 1785 ch. 1.* It has been held that the compact was confined exclusively to matters of jurisdiction and navigation, and left the territorial rights of the parties to it untouched. *Binney's Case, 2 Bland 99, 126, 127.* '

"The compact of 1783 gives no jurisdiction to Pennsylvania over the soil of the Delaware within the territorial limits of this state, nor does it confer on her any right therein."

As power to conserve the potable waters of the river Delaware by legislation, enforceable on, in and under the waters flowing within the boundary and subject to the jurisdiction of the State of New Jersey, was not included in the enumeration of rights to be exercised conjointly by the States of New Jersey and Pennsylvania in the compact of 1783, that power was retained by this state by as clear an implication as though it was, by express language, so reserved in the pact.

It is idle for the defendant to ask of what avail it would be to stop the town of Phillipsburg from discharging its sewage in the Delaware, when the sewage of the city of Easton opposite, and the polluting flow of the Lehigh, are discharged into the same stream in the same locality.

Vice-Chancellor Stevens said, in construing a similar statute, in *State Board of Health* v. *Diamond Mills Paper Co., 63 N. J. Eq. 111* (at *p. 117*):

"The language here used is plain and unambiguous. The prohibition is against placing in the water of the river anywhere above the point from which the city obtains its supply any factory refuse which will either impair, or tend to impair, its quality.

"If, at the place of discharge, the factory refuse put into the

river impairs it, or even tends to impair it, the prohibited act is done."

And I said, when vice-chancellor, in *State* v. *Town of Phillipsburg, post p. 422.*

"Because Easton is polluting the river much more than Phillipsburg (which is regrettable) is no ground for denying an injunction, even if issuance of the writ would be 'futile or inequitable,' as claimed by the defendant. The act in question has been construed in this court and held to extend to a case of refuse which will impair, or tend to impair, the quality of the water." Citing *State Board of Health* v. *Diamond Mills Paper Co., supra.*

The authority given to the state sewerage commission (now vested in the state board of health) in the act which is being pursued in this case, authorizes the board, if it finds that any of the waters of this state are being polluted in such manner as to cause or threaten injury to any of the inhabitants of this state either in health, comfort or property, to apply (after certain preliminary proceedings) to this court for an injunction to prevent violation or to enforce the provisions of the act.

So that, as in the statute under consideration in the *Diamond Mills Paper Co. Case,* the injury need not be actual, but only threatened. In that case the inhibited act was pollution by refuse which would "impair, *or tend* to impair, the quality of the water," and in this case it is, if any of the waters of this state "are being polluted in such manner as to cause *or threaten* injury to any of the inhabitants." Under neither act does actual injury have to be demonstrated.

A word as to the facts: The waters of the Delaware river are used by the inhabitants of this state for potable purposes, and this is so with reference to the supply of drinking water at Trenton. Voluminous testimony was taken, and to my mind it conclusively shows that if the waters of the Delaware river at Trenton are not polluted by infusion of sewage at Phillipsburg in such manner as to cause injury to the inhabitants of Trenton, at least injury to those inhabitants is threatened from that pollution, and, therefore, the case, on the facts, is brought directly within the purview of the statute.

The result reached is that a mandatory injunction must issue in accordance with the prayer of the bill, to compel the town of Phillipsburg to cease its unlawful act of polluting the waters of the Delaware river by permitting sewage and other polluting matter to flow therein from its sewerage systems and drains, and to make such disposal thereof as shall be approved by the state board of health.