BENJAMIN SCHLESINGER, as President of the International Ladies' Garment Workers Union, et al., Plaintiffs, *v*. PHILIP QUINTO, Individually and as Treasurer of the Cloak, Suit and Skirt Manufacturers Protective Association, et al., Defendants.

(Supreme Court, New York Special Term, January, 1922.)

Courts — decision should be in harmony with corrective legislation — agreement adopting week work system in place of piece work and for reduction in hours of labor — employers' association adopted resolution in effect to break agreement — labor union of employees granted an injunction pendente lite — no adequate remedy at law.

The progressive sentiment of advanced civilization which has compelled legislative action to correct and improve conditions which a proper regard for humanity would no longer tolerate, cannot be ignored by the courts, and their decisions should be in harmony with and not in defiance of that modern conception.

After a contract, to continue until June 1, 1922, made between the defendant, an employers' association, and a labor union of garment workers, which provided for the week work system in the place and stead of the so-called piece work system formerly prevailing in the garment industry, and for a reduction in the hours of labor from forty-eight to forty-four hours per week, had gone into effect and the workers were operating thereunder, the defendant broke the contract by the adoption of a resolution which in part stated: "It has become necessary to substitute in the industry the piecework system for the week-work system, to establish an increase of the number of working hours in the week and to fix a reduction of the wages of the workers in those branches of the industry where, by the nature of the services rendered, it is required that they be retained on the week-work system;" and further:

"That in order to bring into full force and effect the above changes in the industrial standards of the industry there be promulgated an order, binding upon every member of this association, that beginning Monday, November 14, 1921, each

Supreme Court, January, 1922. [Vol. 117.

and every member will operate his factory on the piece-work system and at the scale of wages and for the working week established by the executive committee."

This resolution went into effect on October 25, 1921, and ever since has been observed and acted upon by the members of the defendant association. The refusal of plaintiff to accede to the new system of work set up by the employers, as they claimed, in contravention of the collective agreement resulted in what was commonly known as the " garment strike." *Held,* that as under the by-laws of the defendant association its members were bound to and did carry out its directions to repudiate its legal obligations, such act constituted a conspiracy and a violation of plaintiff's legal rights.

It appearing that there are over forty thousand workers whose rights are involved and over three hundred members of the defendant association and that the trial of an action to enjoin the violation of the contract or the doing of any act in furtherance of the conspiracy can hardly be had within the lifetime of the contract, the plaintiffs will be granted an injunction *pendente lite,* they having no adequate remedy at law.

MOTION for injunction *pendente lite.*

Morris Hillquit and Samuel Untermyer, for plaintiffs.

William Klein, Max D. Steuer and Charles H. Tuttle, for defendants.

WAGNER, J. The plaintiffs move to continue *pendente lite* a preliminary injunction enjoining the defendants from combining and conspiring to order, direct, instigate, counsel, advise or encourage members of the defendant association to violate a certain agreement made between the association and plaintiffs' union, and from doing any act in furtherance of such conspiracy.

The contract, the subject of this litigation, was entered into between the Cloak, Suit and Skirt Manufacturers Protective Association, acting on behalf of its members, employees, and the International Ladies'

Garment Workers Union and its subsidiary, the Joint Board of Cloakmakers Unions of the City of New York, representing the employees, on May 29, 1919, to continue operative up to June 1, 1922.

This agreement was the culmination of a long-continued economic struggle between the parties, and for the first time recognized in a collective bargaining contract the week work system in place and stead of the so-called piecework system formerly prevailing in the garment industry, and provided also a reduction in the hours of labor from forty-eight to forty-four hours per week. This innovation the workers regarded as a great stride forward in their struggle to raise their standard of life. Under the piecework system there was no uniform or fixed scale of wages. Besides the constant disputes that arose as to what the employee should receive for a particular garment, the workers contend that the piecework system was an incentive to work with an intensity injurious to their health, principally in view of the fact that the industry is seasonal, the periods of work, therefore, rare, and the worker in his anxiety to make up for the slack time would strain himself beyond his physical endurance and thus fall into ill-health, in many cases hopeless.

After the agreement had gone into effect relations theretofore strained were resumed and peace once more restored in the industry, and the workers began operating under the new system. During the transitional period, as might well have been contemplated in so radical a change in the method of production, complaints were made on both sides respecting " soldiering on the job," due to security of position on the one hand and the inadequacy of wages due to the constant increase in living costs on the other. These difficulties, involving isolated instances, were adjusted by

47

voluntary concessions of higher wage and the averting of intended or actual stoppages of work. And so matters proceeded until the request of plaintiffs on behalf of the workers in the early part of November, 1919, for an appreciable increase in the scale of wages provided for in the contract due to the more aggravated conditions then prevailing, but which clearly in nowise was to affect the integrity and mutuality of obligations under the agreement.

Discussions became more acute on this question as the differences of opinion widened, with the result that the parties found themselves engulfed in an acrimonious controversy, both private and in the advertising columns of the press, in which the respective contentions were strikingly and appealingly presented to gain for themselves public approval and support. Apprehensive of public calamity, Governor Smith summoned representatives of the opposing factions to a conference, resulting in their consent to the appointment of a board, with power to make a final and conclusive disposition of the controversial matter. The report of this board, after an extended examination into the statistics as to increased living costs, made a unanimous finding that the workers were entitled to a wage increase, "called for by certain conditions inherent in the industry," to be absorbed by the increased productivity and conservation of other manufacturing costs.

After acceptance of the board's decision its interpretation caused a divergent view as to the parties to be benefited. Because of the equivocal language in portions of the report the difference of opinion as to its interpretation was not without justification. To the plaintiffs it spelled out a clear increase of the minimum wage scale therein provided. To the defendants the benefits thereunder were to accrue only to those

employed at the time of its rendition and future employees were not entitled to participation.

Attempts to persuade the defendants to confer failed. They insisted upon the correctness of their interpretation and their right of self-construction.

Solicitations that the source of origin, namely, the board, should be requested to interpret its own decision, were summarily refused. The deadlock was further accentuated by plaintiff's claim that independent contractors who had accepted the new award by private agreement and were now seeking membership in defendant association for the purpose of taking advantage of its construction as to who shall benefit by the increase were so accepted in violation of the agreement. Discontent among the workers followed disappointment. Their fruitless appeals to the unions, which in view of defendants' attitude on the question of interpretation could afford no assistance, resulted in sporadic strikes. These were few, however, in comparison with the extent of the work, and in most instances inconsequential in duration. Importunities by plaintiff union succeeded in many cases to a return of the men to work, though it failed in some few instances, owing to the obdurate conduct and inflexible state of mind of the workers.

Finally, on October 6, 1920, the defendant addressed a communication to the union stating on account of strikes against its members the contract obligations had been violated, and threatened a discontinuance of "function of the machinery of the contract for adjustment of grievances." The plaintiffs replied disclaiming any connection with or instigation of strikes, and again appealed for the submission of the question of interpretation of the board's decision as to awards. From then on, in accordance with their previous notification, the defendants ceased the adjustments of fur-

Supreme Court, January, 1922.    [Vol. 117.

ther disputes pursuant to the methods set up in the agreement. The letter itself and the developments that followed are significant of its purpose in view of the claim made by the defendants that thereafter they considered the binding force of the contract at end. By its terms it made no pretense of abrogating the existing agreement as a whole. It confined the discontinuance of recognition merely to one of its provisions, namely, that involving the adjustment of disputes. There was no mention nor implied abandonment of the provisions relating to hours of labor, wages, labor conditions or others that formed the real basis and purpose of the collective bargaining agreement, as indeed there were none in fact, as such were continued and observed in practice long after the adjustment routine had gone into temporary disuse and clearly defendants' refusal to carry out the above-named provision did not, as against plaintiffs' protest and in the absence of rescission, vitiate the agreement.

In April, 1921, communications were again resumed by the association with plaintiffs with the view of increasing the productivity in the trade by reason of the alleged refusal of the public to purchase their product at high prices then obtaining. The union accepted the invitation to conference on this question, and on June 3, 1921, the parties entered into the following agreement:

"(1) Both sides are in accord that it is in the interest of the industry to readjust the same in such a manner as to enable the manufacturers to sell their product at more attractive prices, and they therefore agree to proceed at once to the organization of a joint commission, to be composed of three members of the association and three members of the unions, whose task it shall be:

"(a) To study shop and labor production records

and other available data with a view of working out measures which would tend to bring up the productivity of the workers to a point fair and proper to both sides.

"(b) The commission shall report once a month, and on November 1, 1921, it shall make a final report of its activities and findings before a joint committee of the representatives of the association and the unions, and shall accompany such report with complete and appropriate recommendations.

"(2) Until November 1, 1921, the commission shall also act as a joint appeal committee and shall pass upon all complaints on the part of the employers and discharged workers presented to it by the unions or associations arising out of any controversy or dispute about the adequacy of productivity. In determining any case the labor records of the workers in the shop in question shall be taken as the basis for the committee's decisions. If such records will substantiate the contention of the employer the action of the employer shall be sustained by the committee.

"(3) Both sides agree to enforce compliance with the decisions of the joint committee.

"(4) All complaints shall first be taken up by the clerks of the unions and the association for investigation and adjudication.

"New York, June 3, 1921.

"Cloak, Suit & Skirt Mfrs. Pro. Ass'n.
"Louis Lustig, *Chairman.*
"By Max Lachman, *Vice Chairman.*
"International Ladies' Garment Workers Union.
"Benj. Schlesinger, *Pres.,*
"Joint Board Cloak, Skirt & Reefer Makers Union,
"Israel Feinberg, *General Manager.*"

Supreme Court, January, 1922.   [Vol. 117.

Thereafter the joint commission provided for in the agreement was appointed for the settlement of the disputes arising in regard to lack of productivity and passed upon grievances as presented.

Whether the agreement was a supplemental or supplanting one to that of May 29, 1919, is disputed in the affidavits, the employers contending that the June agreement supplanted the earlier one and alone was in force, leaving them free to take whatever action they deemed fit after the date of its expiration, November 1, 1922, while the plaintiffs claim it was but an amendment of and supplementary to that already existing and in force. Looking at the scope of the agreement's provisions, I think it indubitable that it was neither designed to supplant nor interfere with the contract of May 29, 1919, except to devise some agreeable method after suitable investigation to govern the requirements of production. " The working out of measures which would tend to bring up the productivity of the workers " was its expressed and sole purpose. The appointment of a commission to report its recommendations in that respect was its means. In fact the jurisdiction of the commission to adjust grievances related exclusively to those of adequacy of production. Moreover, the subsequent actions of defendants furnish conclusive evidence that both they and plaintiffs considered the original collective agreement in existence and in full operation.

Subsequent complaints of defendants as to shop strikes were couched in the identical language employed before the supplemental agreement had been made. In such complaints distinct reference was made " to the terms of our agreement." Without a single reference to strikes in the one it could hardly be presumed otherwise than that the other was the basis of the complaint. Numerous compliances by the

association with the requirements of clause 10 as to registration of names and addresses of contractors employed by its members give further support to the view.    The distribution of payments for wages collected from employers after dispute, together with written notices to plaintiffs of the admission of new members, both governed by the original agreement, make irresistible the conclusion that the collective agreement was still in force and so regarded by the parties.

It therefore, so far as the purposes of this motion are concerned, becomes unnecessary and immaterial to decide whether, prior to June 3, 1921, either of the parties had violated or breached the conditions of the agreement.    Whatever had before occurred was to all intents waived by both, and not only was its full operation reinstated on that date and its provisions thereinafter complied with, but an additional instrument had been created to adopt procedure to better carry out its terms.    So, again, whether in the following October, when the association gave notice at a meeting of the commission appointed by the June agreement, through its representatives on said commission, of its intention to substitute the old system of piecework, the plaintiffs protested, as they claim, though this is denied by defendants, that such a recommendation would transcend the powers of the commission and be incompatible with the terms of the collective agreement of May 29, 1919, has no bearing on the legal question here presented.    The June agreement being supplemental to that of May 29, 1919, no recommendation under the former could override or make nugatory the fundamental benefits secured to plaintiffs under the latter.

Subsequently and on October 25, 1921, the association adopted a resolution which in part stated:

Supreme Court, January, 1922. [Vol. 117.

"It has become necessary to substitute in the industry the piecework system for the week-work system, to establish an increase of the number of working hours in the week and to fix a reduction of the wages of the workers in those branches of the industry where, by the nature of the services rendered, it is required that they be retained on the week-work system;" and further:

"That in order to bring into full force and effect the above changes in the industrial standards of the industry there be promulgated an order, binding upon every member of this association, that beginning Monday, November 14, 1921, each and every member will operate his factory on the piece-work system and at the scale of wages and for the working week established by the executive committee," which went into effect on the date named and ever since has been observed and acted upon by the members of said association.

Refusal of the plaintiffs to accede to the new system of work set up by the employers, as they claimed, in contravention of the collective agreement resulted in what is now commonly termed the " garment strike."

Thus out of the mass of affidavits submitted by both sides, with denials and some conflict of facts, there survives clearly a preponderance of evidence in favor of plaintiff establishing its right to the extraordinary relief sought.

While this application is novel, it is novel only in the respect that for the first time an employees' organization is seeking to restrain their employers' organization from violating a contractual obligation.

It is elementary, and yet sometimes requires emphasis, that the door of a court of equity is open to employer and employee alike. It is no respecter of persons — it is keen to protect the legal rights of all.

Heretofore the employer alone has prayed the protection of a court of equity against threatened irreparable illegal acts of the employee.

But mutuality of obligation compels a mutuality of remedy.  The fact that the employees have entered equity's threshold by a hitherto untraveled path does not lessen their right to the law's decree.

Precedent is not our only guide in deciding these disputes, for many are worn out by time and made useless by the more enlightened and humane conception of social justice.  That progressive sentiment of advanced civilization which has compelled legislative action to correct and improve conditions which a proper regard for humanity would no longer tolerate cannot be ignored by the courts.  Our decisions should be in harmony with that modern conception and not in defiance of it.  Some *nisi prius* adjudications rendered in these disputes, disputes in which the public is as much interested as the contending parties, have in my judgment reflected a somewhat imperfect understanding of the trials and hardships experienced by the workers in their just struggle for better living conditions.

Being persuaded by the proof adduced that the contract with its modifications was in force on October 25, 1921, the resolution adopted by the defendant association on said date contemplated a material breach of said contract.  Further, such contemplated breach was carried out, for on the appointed day (November 14, 1921) the members of the association re-established the piecework system in their factories.

Since the members of defendant association were by the by-laws bound to and did carry out the directions of the association to repudiate its legal obligations, the act constituted a conspiracy.  A combination to procure a concerted breach of contract by the

Supreme Court, January, 1922. [Vol. 117.

members constitutes a violation of plaintiffs' legal rights. *Hitchman Coal & Coke Co.* v. *Mitchell,* 245 U. S. 257.

Is, under such circumstances, a court of equity helpless to give succor to plaintiffs? I think not.

In *Grassi Contracting Co.* v. *Bennett,* 174 App. Div. 244, the court said: " Where a strike or other action is threatened by a labor union in violation of its contract or of the contract of its members with their employers, the jurisdiction of a court of equity to issue an injunction is well recognized."

In the case of *Beattie* v. *Callanan,* 82 App. Div. 7, the defendant, a labor union, sought to induce workers who were under contract with their employer to quit work and in other ways to interfere with the performance of the employment contract. The union was enjoined from interfering.

In the well-known case of *Hitchman Coal & Coke Co.* v. *Mitchell,* 245 U. S. 229, a labor union was restrained from " (1) Interfering or attempting to interfere with plaintiff's employees for the purpose of unionizing plaintiff's mine without its consent, by representing or causing to be represented to any of plaintiff's employees, or to any person who might become an employee of plaintiff, that such person will suffer or is likely to suffer some loss or trouble in continuing in or in entering the employment of plaintiff, by reason of plaintiff not recognizing the Union, or because plaintiff runs a non-union mine; (2) Interfering or attempting to interfere with plaintiff's employees for the purpose of unionizing the mine without plaintiff's consent, and in aid of such purpose knowingly and wilfully bringing about the breaking by plaintiff's employees of contracts of service known at the time to exist with plaintiff's present and future employees; (3) Knowingly and

wilfully enticing plaintiff's employees, present or future, to leave plaintiff's service on the ground that plaintiff does not recognize the United Mine Workers of America or runs a non-union mine, etc.; (4) Interfering or attempting to interfere with plaintiff's employees so as knowingly and wilfully to bring about the breaking by plaintiff's employees, present and future, of their contracts of service, known to the defendants to exist, and especially from knowingly and wilfully enticing such employees, present or future, to leave plaintiff's service without plaintiff's consent; (5) Trespassing on or entering upon the grounds and premises of plaintiff or its mine for the purpose of interfering therewith or hindering or obstructing its business, or with the purpose of compelling or inducing, by threats, intimidation, violent or abusive language, or persuasion, any of plaintiff's employees to refuse or fail to perform their duties as such; and (6) Compelling or inducing or attempting to compel or induce, by threats, intimidation, or abusive or violent language, any of plaintiff's employees to leave its service or fail or refuse to perform their duties as such employees, or compelling or attempting to compel by like means any person desiring to seek employment in plaintiff's mine and works from so accepting employment therein.''

Abundant additional precedents exist supporting plaintiffs' plea for equitable relief, but it would serve no useful purpose to enumerate them. The only distinguishing feature in the instant case is that the applicants are the workers. They are entitled to have exercised in their behalf the restraining power of the court when their legal rights are obstructed to the same extent as it has been exercised to protect the contractual rights of the employers.

It cannot be seriously contended that the plaintiffs

have an adequate remedy at law. That the damages resulting from the alleged violation of the agreement would be irremediable at law is too patent for discussion. There are over 40,000 workers whose rights are involved and over 300 members of defendant organization. The contract expires within six months and a trial of the issues can hardly be had within that time. It is unthinkable that the court would force the litigants into a court of law. A court of equity looks to the substance and essence of things and disregards matters of form and technical niceties.

The motion is granted enjoining *pendente lite* defendants herein, their and each of their agents, servants and attorneys, and each and all of their several members, and every officer, director and representative of every corporate member thereof, and all persons acting in aid of or in conjunction with them, or any of them, including members of the said The Cloak, Suit and Skirt Manufacturers' Protective Association, from combining and conspiring in any way, to order, direct, instigate, counsel, advise or encourage the members of the Cloak, Suit and Skirt Manufacturers' Protective Association, or any of them, to cease performing or to violate the agreements of May 29, 1919, and June 3, 1921, made between the said The Cloak, Suit and Skirt Manufacturers' Protective Association and the International Ladies' Garment Workers Union and the Joint Board of Cloakmakers Union of the City of New York, and from doing or sanctioning any act in furtherance or support of such conspiracy; from ordering, directing, instigating, counseling, advising or encouraging such members of the said The Cloak, Suit and Skirt Manufacturers' Protective Association, or any of them, to abrogate and discontinue the provisions of said agreement for the system of week-work in their establishments prior

to June 1, 1922, or to increase the hours of labor in their establishments above forty-four hours per week until the said 1st day of June, 1922; from supporting, aiding or assisting members of the Cloak, Suit and Skirt Manufacturers' Protective Association, or any of them, in any effort to abrogate the existing contract as to the week-work system or increase the labor hours in their establishments by money, contributions or in any other manner whatsoever; from expelling from membership in the said The Cloak, Suit and Skirt Manufacturers' Protective Association, fining or otherwise punishing, disciplining or discriminating against such members of the said association as may agree with the International Ladies' Garment Workers Union and the Joint Board of Cloakmakers Union of the City of New York, or either of them, to resume work in their establishments upon the terms as to the system of work, hours of labor or otherwise, of the agreements between the parties of May 29, 1919; from doing or continuing any act in furtherance of the conspiracy above set forth by means of speech, writing, meeting, or any other method, and from taking any steps whatsoever to put into execution or to retain in force and effect the aforesaid resolution of the said The Cloak, Suit and Skirt Manufacturers' Protective Association, adopted on the 25th day of October, 1921.

And from taking further action for the carrying out of said resolution or of any of the purposes thereof, and they are required to abrogate the same and to cease acting thereunder or under any similar resolution, or from taking or continuing in any concerted action involving the violation or repudiation of said agreement of May 29, 1919, or of any of the terms thereof.

Motion granted.