DAVID DUBINSKY, as President of the International Ladies' Garment Workers' Union, and Another, Plaintiffs, *v.* BLUE DALE DRESS COMPANY, INCORPORATED, and Others, Defendants.

Supreme Court, New York County, December 30, 1936.

*Emil Schlesinger* and *Abraham Schlesinger*, for the plaintiffs.

*Isidore Mesibov* and *Edward Allan Shure*, for the defendants.

McCook, J.  In February, 1936, the Popular Priced Dress Manufacturers Group, Inc., an association of employers (hereinafter called the association), made a collective agreement with the plaintiffs' international and joint board, the latter representing five local unions.  This contract was to run for nearly three years and purported to make effective a desire for co-operation in establishing for the industry a living wage and fair and reasonable conditions of labor and to provide methods for fair and peaceful adjustment of disputes so as to secure uninterrupted operation and general stabilization.  The field was the business of manufacturing dresses which sold at the wholesale price of four dollars and seventy-five cents or less.  Hours, wage scales, union shops and equitable division of work were dealt with and agreed upon by definition.  Removal of factories beyond the five-cent fare carrier limit was forbidden.  The union was to have access to the books of the association members and the right of visits to shops.  It was sought to prevent such incidents as strikes, stoppages and lockouts or alleviate them by provisions for submission of complaints, grievances and disputes by either side to the other, with joint investigation by the manager of the association and the manager of the union or their deputies, and on the failure of agreement by these, reference to a trial board, consisting of a representative of each organization and an impartial chairman.

By application for membership in the association, representation in writing to the plaintiffs, and other acts, the defendants Blue Dale Dress Company, Inc., and its subsidiary, Blue Fox Dress Company, Inc., are to be deemed members of the association from April 25, 1936, and bound by all the terms of the collective agreement.

The plaintiffs charge that the defendants Fishman, the chief officers and substantially the proprietors of the Blue Dale and Blue Fox Corporations, conspiring with the defendant Goldstein, locked out all their workers, members of the plaintiff unions, and

removed their factories from No. 253 West Thirty-fifth street, New York city, where they operated on two floors as separate units, to Archbald, near Scranton, Pa., and continue to lock their employees out and threaten to operate instead a non-union shop at Archbald, thereby violating the collective agreement in two important particulars and causing great and irreparable damage to plaintiffs and their members, for which various forms of relief are sought. The two portions of the agreement particularly applicable read as follows:

" Moving Shops. Twenty-fourth: No member of the association shall, during the term of this agreement, move his shop or factory from its present location to any place beyond which the public carrier fare is more than 5 cents."

" Strikes — Stoppages — Lockouts. Twenty-seventh: During the term of this agreement, there shall be no general lockout, general strike, individual shop lockout or individual shop strike or shop stoppage for any reason or cause, but work shall proceed in operation subject to the determination of any dispute or grievance as hereinafter provided, except where disputes are not settled in the manner provided for in this agreement or wages are not paid on their due date, as provided for herein. There shall be no individual lockout, strike or stoppage pending the determination of any complaint or grievance, except in the cases aforementioned. Should the employees of any shop or factory cause a stoppage of work or shop strike, or should there result in any shop or factory a stoppage of work or shop strike for reasons other than those aforementioned, notice thereof shall be given by the Association to the Union. The latter obligates itself to return the striking workers and those who have stopped work to their work in the shop within twenty-four hours after the receipt by the Union of such notice, except in the cases aforementioned, and until the expiration of such time it shall not be deemed that the striking workers have abandoned their employment. In the event of a substantial violation of this clause on the part of the Union, the Association shall have the option to terminate this agreement. The existence or non-existence of such substantial violation shall be determined by the Trial Board, as constituted under this contract, on all the facts and circumstances.

" Should any member of the Association cause a lockout in his or its shops or factory, notice thereof shall be given by the Union to the Association. The Association obligates itself, within twenty-four hours after the receipt of such notice, to terminate the lockout and to cause its members to re-employ the workers, and until the expiration of such time, it shall not be deemed that the employer has forfeited his rights under the agreement. In the event of a

substantial violation of this clause on the part of the Association, the Union shall have the option to terminate this agreement. The existence or non-existence of such substantial violation shall be determined by the Trial Board on all the facts and circumstances."

Defendants deny the charges and upon the trial have attempted to prove that the plaintiffs did not faithfully perform their part of the agreement, but violated the same by strikes, stoppages and otherwise, so that the defendants were justified in regarding the agreement as at an end. From such facts they seek to draw the conclusion that plaintiffs have not come into equity with clean hands and must be denied any relief.

In their briefs the defendants appear to have abandoned an earlier contention that the collective agreement was void for want of mutuality, a defense which a growing body of authority rejects " as inapplicable to collective agreement cases." (See Simpson, " Fifty Years of American Equity," [1936] '50 Harv. Law Review, 171, at 201, top, and cases cited.) It is consistent with the principle of mutuality to anticipate unauthorized stoppages by groups of employees and, by providing for the adjustment of such complaints, to deprive the employer of the right to treat these incidents as an excuse for abrogating the contract.

There are three issues of fact: (1) Was there a lockout on the last days of November and the first days of December of their employees by defendants? (2) Did defendants move their factory from New York city to Pennsylvania with intention to save money by operating a non-union shop and thus to deprive plaintiffs' members of their employment? (3) Did the plaintiffs so abuse their power in relation to the defendants as to render the further doing of business in New York a practical impossibility?

The court finds a lockout occurred on October twenty-ninth. The formal labor complaint filed by plaintiffs, joined in by the managers of the association and the union through their deputies, and the manner of its reception by the Fishmans, make that clear; the resignation of the corporations from the association on October thirty-first, and the secret removal of the machines the same night from New York to Archbald complete the picture.

At the outset defendants contended that the taking of the lease in Archbald was the act of Goldstein as an individual. After the latter admitted on the stand that he was a nephew of the Fishmans, that he was financially irresponsible, and that he and Abraham Fishman had conversed with the visitor from Archbald, Pa., it could no longer be doubted that he was merely a dummy for his uncles and their corporations. From the admissions of the Fish-

mans and regarding the situation as a whole, it is equally clear that the intention was at one stroke to get rid of the obligations of the contract and to obtain cheaper non-union labor in a more indulgent community. The court finds in favor of the plaintiffs on this point also.

There is a close relation, in law as well as fact, between the second and third points. The date of the Archbald lease was October tenth. The earliest New York cases accept the principle, now regarded as elementary, that a party contemplating rescission must elect between that remedy and the course of pursuing his contract rights; that he may not accept acts insisted on as performance by the other party and then be permitted to rescind. (*Genet* v. *Delaware & Hudson Canal Co.*, 28 App. Div. 328.) The principle was expressly extended to labor union cases by this court in *Schlesinger* v. *Quinto* (117 Misc. 735; affd., 201 App. Div. 487), where WAGNER, J., said, in commenting on a somewhat similar situation: " It therefore, so far as the purposes of this motion are concerned, becomes unnecessary and immaterial to decide whether, prior to June 3, 1921, either of the parties had violated or breached the conditions of the agreement. Whatever had before occurred was to all intents waived by both." (117 Misc. 735, 743.)

Apart from this principle of law, the significance of the date of the signing of the lease, October tenth, lies in its relation to the date of the alleged general strike, October nineteenth. The court finds from all the facts that no general strike or any strike occurred on or about that date, and is of opinion that the claim was put forward by defendants to becloud the issue by meeting in advance the plaintiffs' claim of waiver.

There was a strike, or stoppage of work, on July twenty-fourth, conducted spontaneously by the shop girls of Blue Dale in sympathy with defendants' shipping clerks then on strike. It was disavowed by the union, and the girls returned to work the same afternoon. There was a strike of cutters on July twenty-ninth, attributable to their belief that the Fishmans were themselves violating the agreement by cutting at night. It was called by the union, contrary to the agreement. The Fishmans appealed to the principle of arbitration and were sustained by the impartial chairman. The union promptly notified the cutters to return to work but, partly because they were informed of the decision on a Friday afternoon with two non-working days to follow, partly perhaps through the dissatisfaction of the men themselves, their return was delayed until the following Tuesday or Wednesday. However, the defendants did not complain of non-compliance nor, as they had the

right to do under the agreement, hire other cutters. Apparently the explanation is that the Fishmans had plenty of work already cut in advance so did not care. At all events the defendants invoked in each of these two cases their rights under the contract and in each instance obtained substantial justice from the arbitral machinery they had themselves set going.

There is considerable conflict as to other incidents after the cutters' strike and before the signing of the Pennsylvania lease. Defendants charge that the girls again struck in August, but the court accepts the testimony of the employees supported by that of the association's manager against the Fishmans and finds no such strike occurred. There followed complaints of assault, insult, stoppages, inferior workmanship and unequal distribution, now by one side, now by the other, but all these disputes were, so far as the record shows, adjusted informally. The July episodes got the parties off to a bad start and thereafter honors were about even on settlements and decisions. The unfortunate result seems attributable to a head-on collision between a union conscious of power and an employer with an unenviable business record, an aggressive personality, and a determination to make a success this time at all costs. The important difference between the methods adopted by the two sides is that the plaintiffs continued content with the collective agreement, while the defendants grew more and more dissatisfied with it, and when they found themselves unable to obtain its modification took the law into their own hands through the radical and conclusive step of making the Archbald lease. Their conduct thereafter has already been sufficiently discussed.

Defendants have seen fit to criticize the officers of the association for subserviency to the union and indifference to their own members, the defendants, but these officials seem on the face of things to have done their duty. If they were not ardent defenders of these particular members an explanation simpler than disloyalty presents itself. There were other members of the association. One of the chief objects of joining was protection against unfair competition. If plaintiffs' charges are true, it is not natural to suppose that defendants' general popularity in the association would grow by reason of their attitude, nor could its officers be expected to register great enthusiasm for the Fishmans individually. At any rate, some of the most important assertions made by the latter as witnesses were flatly contradicted by the association's manager and the impartial chairman. The court is unable to find evidence of any such conduct on the part of the plaintiffs as would disqualify them, on any recognized equitable theory, from asserting and

maintaining their rights in the premises under the collective agreement.

It follows that defendants should be directed, so long as they remain in this industry, to comply with the terms of the collective agreement, specifically by putting all the members of plaintiffs' union whom they locked out on October twenty-ninth and thereafter back to work, or as many of them as they may have work for, anywhere; by moving back within the agreed area in New York city all the machinery and other effects hitherto removed to Archbald, since they cannot be made to abide by the contract in Pennsylvania. The language of the agreement is clear, a proper occasion is presented, and so far as any precedent exists it favors the remedy. (*Farulla* v. *Freundlich, Inc.*, 152 Misc. 761; 153 id. 738; 155 id. 262.) The logic of the situation calls for application of strong measures. With the end of NRA (48 U. S. Stat. at Large, 195) appeared a new need for such contracts as the one in suit. Without a remedy as wide as that need, unscrupulous employers of labor will be tempted to play one community off against another, unlawfully depriving New York city of her business and her inhabitants of their livelihood. For a discussion of the entire subject, see " Legal Problems Raised by the Relocation of Industry: The Runaway Shop " (36 Col. Law Rev. 776).

[It has been suggested that this court may lack jurisdiction or find that a thoroughgoing decree cannot be enforced. Neither objection appears to possess substance or validity. The Fishmans have appeared and defended, and so has their agent Goldstein. Between them they own or control the stock of both corporations, the lease in New York and the lease outside the State. The Blue Dale and Blue Fox alike are New York corporations, which still maintain offices at the old address in Manhattan. All the parties, therefore, who are found to have acted in concert to create the lockout and effect the removal are before the court and subject to its mandate.

The defendants also should be compelled to account to the plaintiffs by reason of the lockout, and a referee will be appointed to compute the compensatory damages sustained by members of the plaintiff union.

Settle decree accordingly.