COLUMBIA NASTRI & CARTA CARBONE, S/p/A, a corporation organized and existing under the Laws of Italy, formerly known as Columbia Ribbon & Carbon Manufacturing Company, S/p/A-Milano (also a corporation organized and existing under the Laws of Italy), Plaintiff-Appellant,

v.

COLUMBIA RIBBON & CARBON MANUFACTURING CO., Inc., a corporation organized and existing under the laws of the State of New York, Defendant Appellee.

No. 2, Docket 30334.

United States Court of Appeals
Second Circuit.

Argued Sept. 20, 1966.

Decided Oct. 19, 1966.

Louis A. Sabatino, Miami, Fla. (Zock, Petrie, Sheneman & Reid, and Howard M. McCormack, New York City, on the brief), for plaintiff-appellant.

George Link, Jr., New York City (McKercher & Link, and James J. Brogan, New York City, on the brief), for defendant-appellee.

Before LUMBARD, Chief Judge, and WATERMAN and ANDERSON, Circuit Judges.

LUMBARD, Chief Judge.

The appellant, Columbia Nastri & Carta Carbone, S/p/A, an Italian corporation, brought this diversity action in the Southern District of New York to recover $41,100 which it paid to the appellee, Columbia Ribbon & Carbon Manufacturing Co., Inc., a New York corporation, as royalties for the use of certain trademarks in Italy during the years 1949 through 1958. The Italian corporation claimed that the Italian trademarks were its property, since they were registered in Italy in its name, and that it had paid the royalties in the mistaken belief, induced by the misrepresentations of the American corporation, that the American corporation owned the trademarks.

After a trial without a jury, Judge Palmieri found that the trademarks were the property of the American corporation, and that the royalty agreement under which the Italian corporation used them was terminated when the Italian corporation refused to pay further royalties and brought this action in 1959. He ordered the Italian corporation to assign the Italian trademarks to the American corporation, to delete the word "Columbia" from its corporate name, to refrain from using the trademarks or the name "Columbia" in the sale of carbon paper and inked ribbons, and to pay $5,500 a year, plus interest, for its use of the trademarks and of the American corporation's know-how during the pendency of this action.

The Italian corporation attacks the findings that it holds the Italian trademarks as constructive trustee for the American corporation, and that the royalty agreement was terminated by its actions. It also contends that it should not have been ordered to pay for its use of the trademarks after the expiration of the royalty agreement in 1960, or to delete the word "Columbia" from its corporate name. We find no error in these findings and orders, and affirm.

The American corporation, which manufactures carbon paper, inked ribbons, and other duplicating materials, formed the Italian corporation as a wholly owned subsidiary in 1924 to manufacture the same products in Italy. The trademarks here in dispute, which are registered by the American corporation elsewhere in the world, were first registered in its name in Italy and then reregistered in the Italian corporation's name. This was done, Judge Palmieri found, because of the xenophobic economic policy of the Fascist government.

In 1949 all the stock of the Italian corporation, then over three-quarters owned by the American corporation, was sold to three Italian nationals, Count Alberto Zorli, Enrico Melchionni, and Cesare Trivulzio. The memorandum of sale, dated April 15, 1949, provided for a royalty of $3,600 annually through 1951, with a new royalty to be negotiated thereafter. A royalty agreement, dated May 16, 1949, was executed, about the time the sale of stock was consummated in late June 1949, by the Italian corporation's then Director General and Managing Director, Dr. G. B. Punzi, who died before trial of this case. The agreement listed the trademarks now in dispute and expressly granted the Italian corporation exclusive permission to use them in Italy. It also provided that if it were terminated by the American corporation, the Italian corporation should delete the word "Columbia" from its corporate name and refrain from using it. A supplementary agreement dated June 6, 1949 stated that failure to pay royalties would be cause for termination.

Relations between the two corporations remained harmonious for a decade. The American corporation supplied technical formulae and know-how to the Italian corporation as it had done before 1949. The royalty agreement was extended in 1952 and 1955, with the royalty increased to $5,000 annually for 1955–1957 and $5,500 annually for 1958–1960. The annual royalties were paid without complaint until 1959, during most of which period Trivulzio was Director General and Managing Director of the Italian corporation.

In June 1959, after Trivulzio sold his stock to Count Zorli and the latter be-

came Director General and Managing Director, negotiations between the two corporations for a new extension of the royalty agreement broke down. In a letter dated June 29, 1959, the Italian corporation asserted that the Italian trademarks ·were its property and that the royalty agreement was void, and stated that it would pay no further royalties. Since the Italian corporation brought this action in the Southern District of New York in 1959, it has continued to use the Italian trademarks, the name "Columbia," and the know-how previously gained from the American corporation. The American corporation has refrained from entering the Italian market.

The evidence amply supports Judge Palmieri's conclusion that under New York law, which he found to govern and which both parties apparently agree governs this case,[1] the Italian corporation held the Italian trademarks registered in its name as constructive trustee for the American corporation. Judge Palmieri found that both Punzi and Trivulzio, as successive Directors General of the Italian corporation, knew that the American corporation owned the trademarks. He also found that Count Zorli, Melchionni, and Trivulzio "knew or should have known" it when they purchased their stock. These findings, fully supported by the documentary evidence and by the testimony of Trivulzio and officers of the American corporation, justify the imposition of a constructive trust on the trademarks in favor of the American corporation. Cf. Katzman v. Aetna Life Ins. Co., 309 N.Y. 197, 202–203, 128 N.E.2d 307, 309–310 (1955).

■ The Italian corporation assails this conclusion on two grounds. First, it argues that there is no written memorandum of the parties evidencing the creation of any trust. But no intent to create a trust, and a fortiori no such memorandum, is required for declaration of a constructive trust. Equity Corp. v. Groves, 294 N.Y. 8, 13, 60 N.E.2d 19, 21 (1945) (dictum); see Latham v. Father Divine, 299 N.Y. 22, 85 N.E.2d 168, 11 A.L.R.2d 802 (1949).

■ Second, it argues that the testimony of Trivulzio, which the trial court found "credible and persuasive," was so self-contradictory that the court should instead have relied on the testimony of the Italian corporation's present officers, who testified that it owned the Italian trademarks. The asserted contradiction arises from Trivulzio's testimony on interrogatory, apparently to the effect that he always knew the trademarks belonged to the American corporation,[2] and his

---

1. The secretary of the Italian corporation testified as an expert on Italian law that under that law the "ownership" of a trademark is in the registrant. The trial court indicated in colloquy, however, that it regarded this testimony as irrelevant to the issue of a constructive trust under New York law, and plaintiff's counsel did not argue that any other law controlled. Neither party argues on this appeal that any substantive law other than that of New York is governing.

The American corporation is incorporated, has its headquarters, and apparently approved the agreements here involved in New York. Under the New York "grouping of contacts" rule, these contacts with New York might have been sufficient for New York law to govern this case, had the issue been raised. Cf. Perrin v. Pearlstein, 314 F.2d 863 (2 Cir. 1963). Compare Restatement (Second), Conflict of Laws §§ 332b, 354k (Tent.

Draft No. 6, 1960); Ehrenzweig, Conflict of Laws 601–02 (1962). Since the issue has not been raised by the parties, and especially since the record does not contain the facts needed to resolve it, this Court will not raise it of its own motion. See Republic of Iraq v. First Nat'l City Bank, 353 F.2d 47, 51 n. 3 (2 Cir. 1965), cert. denied, 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 648 (1966); Currie, On the Displacement of the Law of the Forum, in Selected Essays on the Conflict of Laws 3, 36–39 (1963). Compare Walton v. Arabian American Oil Co., 233 F.2d 541 (2 Cir.), cert. denied, 352 U.S. 872, 77 S.Ct. 97, 1 L.Ed.2d 77 (1956); Ehag Eisenbahnwerte Holding AG. v. Banca Nationala a Romaniei, 306 N.Y. 242, 249, 117 N.E.2d 346, 349 (1954).

2. Trivulzio's interrogatories were read at trial, but were not transcribed in the trial record and are not part of the record on appeal.

statement in a deposition suppressed by Judge McLean prior to trial that he "was fully convinced" that they belonged to the American corporation.

■ We are unable to perceive any contradiction; both statements indicate that the American corporation's ownership was accepted by both parties. Even if Trivulzio's testimony is disregarded, the testimony of the American corporation's officers and the documentary evidence fully support the trial court's rejection of the testimony of the Italian corporation's officers. Moreover, the deposition was suppressed because it was taken by appellant's counsel while an order restraining its taking was outstanding, an order of which appellant's New York counsel had personal notice. Apparently no motion to reopen the order of suppression was made at trial. Since the trial court was not asked to admit the suppressed deposition, its failure to do so cannot be raised on appeal. Fed. R.Civ.P. 46.

■ The Italian corporation next disputes the trial court's conclusion that its nonpayment of royalties and institution of this action justify the termination of the royalty agreement by the American corporation. It argues that it acted in good faith, and that a judgment for the unpaid royalties is a sufficient remedy. The parties' supplementary agreement dated June 6, 1949 provided, however, that the royalty agreement could be terminated for failure to pay royalties.

■ The Italian corporation further contends, somewhat inconsistently, that it was improper to award the Ameri-

can corporation $5,500 a year, the royalty set by the agreement for 1958–1960, for the period after 1960, when the royalty agreement had expired. It assumes that the trial court held that the royalty agreement continued to be valid after 1960, and granted these sums as damages for breach of it. The trial court awarded the sums, however, and properly, as restitution of the benefits the Italian corporation received from its use of the American corporation's trademarks and know-how and from the American corporation's abstention from the Italian market. See Matarese v. Moore-McCormack Lines, Inc., 158 F.2d 631 (2 Cir. 1946); Restatement, Restitution § 157 (1937). Absent other evidence of the value of these benefits, it was proper to use the most recent value agreed upon by the parties. Cf. 5 Corbin, Contracts 601 (rev. ed. 1964).[3] Although the American corporation did not specifically seek monetary relief in its counterclaim, it is clear that the court below could grant such relief. Fed.R.Civ.P. 54(c).

The Italian corporation's final contention is that it should not have been ordered to remove the word "Columbia" from its corporate name. This order practically, if not necessarily, compels affirmative action by the Italian corporation in Italy. Moreover, so far as appears from the record, the Italian corporation's manufacturing and selling activities are restricted to Italy. If this is so, the Italian corporation's use of the name "Columbia" probably produces no effects within the United States, except on the level of profits remitted to the American corporation.[4] The Italian cor-

3. Since we affirm the award of these sums on a restitutional basis, we need not consider appellant's challenge to the trial court's characterization of the 1955 royalty agreement as "a continuing agreement * * * in all respects similar to" the 1949 agreement. Appellant does not question the trial court's implicit finding that the parties intended the understanding as to acts justifying termination by the American corporation reached in the supplementary agreement of June 6, 1949 to remain applicable under the identical terms of the 1955 agreement.

4. The record shows that the American corporation has a manufacturing subsidiary in Great Britain, from which it seems reasonable to assume it could supply the Italian market.

The facts that the appellant is not an American corporation and that the impact of its activities upon the United States is so limited arguably distinguish Steele v. Bulova Watch Co., 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 252 (1952), on which the trial court relied. Cf. Vanity Fair Mills, Inc. v. T. Eaton Co., 234 F.2d 633, 642–643 (2 Cir.), cert. denied, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956).

poration argues that under these circumstances the district court lacked jurisdiction to order it to cease using the name "Columbia," or, at least, that it abused its discretion in doing so. We agree with neither contention.

■ Under the New York cases,[5] the district court had jurisdiction to issue the order. It is true that early New York cases appeared to hold that New York courts lacked power to order action outside New York. See, e. g., People v. Central R. R. of New Jersey, 42 N.Y. 283, 303–306 (1870); cf. Beale, The Jurisdiction of Courts Over Foreigners, 26 Harv.L.Rev. 283, 292–94 (1913). But as other courts abandoned this doctrine in favor of the view that they may in appropriate cases order action outside their jurisdictions, see Recent Decision, 42 Colum.L.Rev. 479 (1942), New York courts followed suit. The Court of Appeals in 1925 upheld an injunction restraining the commission of certain acts in a foreign country, Niagara Falls Int'l Bridge Co. v. Grand Trunk Ry., 241 N.Y. 85, 148 N.E. 797 (1925), and such injunctions seem generally no less difficult to enforce than affirmative ones. See Goodrich, Conflict of Laws 138–39 (4th ed. Scoles 1964). And lower New York courts have twice ordered affirmative action outside New York. Dubinsky v. Blue Dale Dress Co., Inc., 162 Misc. 177, 292 N.Y.S. 898 (Sup.Ct.1936); Madden v. Rosseter, 114 Misc. 416, 187 N.Y.S. 462 (Sup.Ct.), aff'd mem., 196 App.Div. 891, 187 N.Y.S. 943 (1st Dep't 1921). We therefore conclude that a New York court would have jurisdiction to make the order the district court did.

We also hold that the order was not an abuse of discretion under the New York standard. In so holding we recognize that, as stated in Restatement (Second),

Conflict of Laws § 94, Comment b (Tent. Draft No. 4, 1957):

> such relief will be granted only when clearly required by the demands of justice, convenience and economy. The reluctance of courts to issue such an order stems primarily from (1) the fear of interfering unduly with the affairs of the other state and (2) the possible difficulty of enforcing obedience to an order that the defendant do an act in a place beyond the effective control of the court.

We think that "justice, convenience and economy" require here that the Italian corporation be ordered to relinquish the name "Columbia." The Italian corporation initiated this action in the Southern District of New York, demanding that the ownership of the Italian trademarks be adjudicated. The American corporation's demand to enforce the contract by requiring the Italian corporation to give up the name "Columbia" was very likely a compulsory counterclaim in this action. Cf. Lesnik v. Public Industrials Corp., 144 F.2d 968, 975–976 (2 Cir. 1944). "Convenience and economy" clearly required, when the district court had determined whether the royalty agreement was valid and validly terminated, as the Italian corporation asked it to do, that the court grant the American corporation the full relief to which its determination showed it was entitled. Having asked the court to settle matters between the parties, the Italian corporation is hardly in a position to complain that it has done so.

The Italian corporation has made no showing, and it seems unlikely, that the order conflicts with any articulated policy of Italy. Cf. Ramirez & Feraud Chili Co. v. Las Palmas Food Co., 146 F.Supp. 594, 602 (S.D.Cal.1956), aff'd per curi-

---

5. Since we hold that the injunction was proper under New York law, we do not reach the issue whether a federal court may grant an injunction in a diversity case where a state court would not. Cf. Guffey v. Smith, 237 U.S. 101, 35 S.Ct. 526, 59 L.Ed. 856 (1915); The Maccabees v. City of North Chicago, 125 F.2d 330 (7 Cir. 1942), cert. denied, 317 U.S.

693, 63 S.Ct. 432, 87 L.Ed. 555 (1943).

For the reasons set forth in footnote 1, we also do not reach the issue whether New York would measure the propriety of an injunction in this case by its own or another substantive law. Compare Franke v. Wiltschek, 209 F.2d 493, 497 (2 Cir. 1953).

am, 245 F.2d 874 (9 Cir. 1957), cert. denied, 355 U.S. 927, 78 S.Ct. 384, 2 L.Ed. 2d 357 (1958). Under the circumstances of this case, it is not a requisite to the issuance of the injunction that the applicant show that it can be enforced. Cf. Note, 35 Harv.L.Rev. 610, 612 (1922).

Affirmed.